UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MEIJER, INC. and MEIJER DISTRIBUTION, INC., | ) ) ) | Civil Action 08-CV-2431 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| BIOVAIL CORPORATION, et al. | ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL 572 HEALTH AND WELFARE FUND, | ) ) ) | 08-CV-2433 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| BIOVAIL CORPORATION, et al., | ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| ROCHESTER DRUG CO-OPERATIVE, INC., | ) ) ) | 08-CV-2462 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| BIOVAIL CORPORATION, et al., | ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| AMERICAN SALES COMPANY, INC., | ) ) | 08-CV-2462 Philadelphia, PA |
| Plaintiff, | ) ) | August 4, 2009 |
| v. | ) ) | |
| BIOVAIL CORPORATION, et al., | ) ) | |
| Defendants. | ) | |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MARY A. McLAUGHLIN
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

| | |
|---|---|
| For the Plaintiff<br>Meijer, Inc.: | THOMAS SOBOL, ESQUIRE<br>Hagens, Berman, Sobol & Shapiro, LLP<br>One Main Street<br>Cambridge, Massachusetts 02142 |
| | JOSEPH RODA, ESQUIRE<br>RodaNast, P.C.<br>801 Estelle Drive<br>Lancaster, Pennsylvania 17601 |
| For the Plaintiff<br>Rochester Drug<br>Cooperative, Inc.: | PETER KOHN, ESQUIRE<br>Berger & Montague, P.C.<br>1622 Locust Street<br>Philadelphia, Pennsylvania 19103 |
| For the Plaintiff<br>Plumbers and<br>Pipefitters Local<br>572 Health and<br>Welfare Fund: | JENNIFER CONNOLLY, ESQUIRE<br>AMBER M. NESBITT, ESQUIRE<br>Wexler Wallace, LLP<br>55 West Monroe Street<br>Chicago, Illinois 60603 |
| | DAVID J. COHEN, ESQUIRE<br>Saltz, Mongeluzzi, Barrett &<br>Bendesky, P.C.<br>One Liberty Place<br>1650 Market Street<br>Philadelphia, Pennsylvania 19103 |
| For the Defendant<br>SmithKline Beecham<br>Corp.: | MICHAEL STADNICK, ESQUIRE<br>Kirkland & Ellis<br>153 East 53rd Street<br>New York, New York 10022 |
| | EDWARD D. ROGERS, ESQUIRE<br>Ballard, Spahr, Andrews & Ingersoll<br>1735 Market Street<br>Philadelphia, Pennsylvania 19103 |

Appearances: Continued


For the Defendant            MICHAEL SEAN ROYALL, ESQUIRE
Biovail:                     AMANDA TESSAR, ESQUIRE
                             Gibson, Dunn & Crutcher
                             1801 California Street
                             Denver, Colorado  80202


                             THOMAS E. ZEMAITIS, ESQUIRE
                             Pepper, Hamilton & Scheetz
                             18th & Arch Streets
                             Philadelphia, Pennsylvania 19103


Audio Operator:              Raymond Wolf


Transcribed by:              DIANA DOMAN TRANSCRIBING SERVICES
                             P.O. Box 129
                             Gibbsboro, NJ  08026
                             PHONE:  (856)435-7172
                             FAX:    (856) 435-7124
                             Email:  Dianadoman@Comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

Page 4

I N D E X

ARGUMENT:                                          PAGE NUMBER

Reference:  Class Discovery

  By Mr. Sobol                                       10

  By Mr. Royall                                      14

Reference:  Requested Initial Disclosures     PAGE NUMBER

  By Ms. Tessar                                    19, 26

  By Mr. Kohn                                        21

  By Mr. Stadnick                                    24

Reference:  ESI and PRE Issues                PAGE NUMBER

  By Mr. Roda                                      42, 48

  By Mr. Royall                                    46, 50

Reference:  General Colloquy Regarding Case   PAGE NUMBER

  By Mr. Stadnick                                    51

  By Mr. Roda                                        52

Reference:  Categorical Privilege Logs        PAGE NUMBER

  By Mr. Royall                                    56, 59

  By Mr. Sobol                                       57

Reference:  Future Scheduling                 PAGE NUMBER

  By Mr. Sobol                                     63, 73

  By Mr. Royall                                  70, 74, 78

Colloquy                                Page 5

1           (The following was heard in open Court at 10:28 a.m.)

2           COURTROOM DEPUTY:  All rise.

3           THE COURT:  Good morning, everyone.

4           MR. RODA:  Good morning, Your Honor.

5           MR. SOBOL:  Good morning, Your Honor.

6           MR. KOHN:  Good morning, Your Honor.

7           MR. COHEN:  Good morning, Your Honor.

8           MR. ROYALL:  Good morning, Your Honor.

9           MS. TESSAR:  Good morning, Your Honor.

10          MR. STADNICK:  Good morning, Your Honor.

11          THE COURT:  Please be seated.  Well it's nice to see

12   you all again.  I guess most of you I've seen before.  Shall we

13   start with having everyone introduce themselves, if you don't

14   mind.  Let's start with counsel for the plaintiffs.  Where are

15   we going to start?

16          MR. RODA:  Joseph Roda, Your Honor, for the

17   plaintiff.

18          THE COURT:  Of course.  How are you, sir?  Let me

19   just get you on the list.  Are you in order, or no?  Maybe not.

20   Who are you, sir?

21          MR. SOBOL:  Good morning, Your Honor.  Tom Sobol --

22   S-O-B-O-L --

23          THE COURT:  Okay.

24          MR. SOBOL:  -- for the Direct Purchaser also.

25          THE COURT:  All right, hold on for one second.

Colloquy                                Page 6

1   You're Mr. Sobol.  Yes, ma'am?

2           MS. NUSSBAUM:  Linda Nussbaum, Your Honor, for the

3   Direct Purchaser Plaintiffs.

4           THE COURT:  Linda Nussbaum?

5           MS. NUSSBAUM:  Yes.

6           THE COURT:  Yes, okay.

7           MS. NUSSBAUM:  Thank you.

8           THE COURT:  I'm just putting you in order according

9   to the way you're sitting.  Yes?

10          MR. ZYLSTRA:  Good morning, Your Honor.  Kendall

11  Zylstra, Faruqi and Faruqi, for the Indirect Class --

12          THE COURT:  Okay.

13          MR. ZYLSTRA:  -- and I guess there's some question

14  about whether and to what extent we're invited, but I'm here at

15  the Court's --

16          THE COURT:  Oh, well you're certainly invited,

17  certainly invited.

18          MR. ZYLSTRA:  Thank you.

19          THE COURT:  All right, so it's Mr. Roda, Mr. Sobol,

20  Ms. Nussbaum, and Mr. -- say your last name again?

21          MR. ZYLSTRA:  Zylstra.

22          THE COURT:  Zylstra.

23          MR. ZYLSTRA:  Yes, ma'am.

24          THE COURT:  Okay.  And over here for -- and oh, I

25  have a lot of names here.  Why don't we just have people in the

Colloquy                              Page 7

1    back -- at least those who signed the list -- or anybody, stand

2    up, let me see who is everybody is.

3              MR. RADICE:  John Radice, Your Honor, on behalf of

4    the Direct Purchaser Class.

5              THE COURT:  Okay, so this is -- all of you are the

6    plaintiff's counsel in back?

7              UNIDENTIFIED COUNSEL:  Yes.

8              THE COURT:  Okay.  Yes?  Yes, sir?

9              MR. KOHN:  My name is Peter Kohn, Berger and

10   Montague, also for the Direct Purchaser.

11             THE COURT:  All right.  Let me ask you this.

12   Everyone who's going to be speaking, are they all at counsel

13   table, or might other people -- they're not?

14             MR. KOHN:  I may be speaking, Your Honor.

15             THE COURT:  You may be, well I'm happy to have you.

16   I just wanted to know.  Okay, that's fine.  Whenever people are

17   speaking, would you mind just stating your name for the record?

18   All right, so I got this gentleman who is Mr. Kohn.  And yes,

19   sir?

20             MR. COHEN:  Good morning, Your Honor.  David Cohen

21   from Saltz Mongeluzzi for the Indirect Purchaser Class.

22             THE COURT:  Okay, nice to see you.

23             MS. NESBITT:  Good morning, Your Honor.  Amber

24   Nesbitt of Wexler Wallace for the Indirect Purchaser Class.

25             THE COURT:  Thank you.

Colloquy                                Page 8

1      MR. CONNOLLY:  Good morning, Your Honor.  Steve

2  Connolly with Faruqi and Faruqi for the Indirect Purchaser

3  Class.

4      THE COURT:  Okay, thank you.  Are there any other

5  lawyers in the back?  No?  Yes, sir?  Okay, over here on the

6  defense side.

7      MR. ROYALL:  Good morning, Your Honor.

8      THE COURT:  Good morning, sir.

9      MR. ROYALL:  Sean Royall from Gibson, Dunn and

10  Crutcher.  I'm here on behalf of Biovail.

11      THE COURT:  All right, nice to see you.

12      MS. TESSAR:  Good morning.  Amanda Tessar, also from

13  Gibson, Dunn and Crutcher on behalf of Biovail.

14      THE COURT:  Thank you.

15      MR. ZEMAITIS:  Thomas Zemaitis, Pepper Hamilton for

16  Biovail.

17      THE COURT:  Thank you very much.  So you're in order,

18  okay.  This is easy.

19      MR. ROGERS:  Good morning, Your Honor.  Ed Rogers of

20  Ballard Spahr for the Glaxo SmithKline defendants.

21      THE COURT:  Okay.

22      MR. STADNICK:  Good morning, Your Honor.

23      THE COURT:  Good morning.

24      MR. STADNICK:  Michael Stadnick from Kirkland and

25  Ellis for the SK defendants.

Colloquy                                Page 9

1            THE COURT:  Is it Stadnick?

2            MR. STADNICK:  Stadnick, yes.

3            THE COURT:  S-T-A-D --

4            MR. STADNICK:  N-I-C-K.

5            THE COURT:  Okay, S-T-A-D-N-I-C-K, that's fine.

6            MR. PARK:  And good morning, Your Honor.

7            THE COURT:  Good morning.

8            MR. PARK:  Chong Park with Kirkland and Ellis for GSK

9    defendants, Your Honor.

10           THE COURT:  Okay.  Mr. Park?

11           MR. PARK:  Yes.

12           THE COURT:  Okay.  Thank you very much.  All right,

13   everyone, I thought as an agenda we might just go through the

14   report that I received from you all, the joint Rule 26(f)

15   Report, starting with confidentiality of documents.  As I

16   understand it, both sides agree to the confidentiality order

17   that was presented to me, correct?

18           UNIDENTIFIED COUNSEL:  Correct, Your Honor. 10:31:38

19           THE COURT:  Okay.  So I have gone through it and I

20   will -- I take it you want me to sign that and I will sign that

21   order.  Okay, so that's that.  That was an easy one.  Now the

22   timing of class and merits discovery, and I know there is a

23   dispute between the plaintiffs and the defendants on this, and

24   I guess I'd like to hear some discussion about it.

25           You know, in the old days, as I call them, when

1   plaintiffs would have to file their class motion real quickly

2   -- you know, fast, it would be rather pro forma and then their

3   reply brief would be the main brief.  But here, I know

4   everyone's proposing that he class motion be filed -- I guess

5   it's in -- now I'm forgetting, what's the date you're giving me

6   -- December, is it?

7           MR. SOBOL:  December 14th.

8           THE COURT:  December 14th, all right, which I guess

9   by that time I assume there will have been some discovery

10  taken, if not all of the necessary class discovery and so that

11  will be done on December 14th.  And then as I understand it,

12  the defendants want to continue with class discovery until they

13  file their opposition brief, is that correct?

14          UNIDENTIFIED COUNSEL:  Yes, Your Honor. 10:32:53

15          THE COURT:  Okay.  But as I understand it -- forgive

16  me, sir -- this is Mr. Sobol -- Mr. Sobol, you want to continue

17  with class discovery indefinitely, is that correct?

18          MR. SOBOL:  No, Your Honor.

19          THE COURT:  I mean to the end of merits discovery,

20  not indefinitely.

21          MR. SOBOL:  That's correct, although I think what we

22  do is -- I think the issue between the parties is a little bit

23  of a tempest in the teapot, but before I get to the tempest in

24  the teapot, let me take a step back to address your broader

25  question about the standards for rule certification and why we

Sobol - Argument                                    Page 11

1    see this as somewhat more interwoven than historically may

2    have been the case.  As Your Honor is well aware, there are

3    standards for class certification being enunciated in a

4    variety of circuits, including this circuit, which require at

5    least the level of exposition by the Court as well as the

6    parties to be more detailed than it has been historically.

7           In an anti-trust case like this one, that comes into

8    play in at least two material respects.  First, the impact of

9    the alleged anti-trust violation broadly upon the class, which

10   is a factual issue that gets tested throughout the discovery

11   stages.  And then second, also the ability to prove damages on

12   a class-wide basis, which itself might also go throughout the

13   history of fact discovery.

14          Those two issues of impact and damages, to be sure,

15   there will be we hope -- the plaintiffs hope -- substantial

16   discovery prior to the time that we file our brief, which we

17   anticipate would address all of the issues that under this new

18   heightened standard, impact and fully damages.

19          We would expect though that because December is

20   rolling -- coming around the corner, just like it's August

21   already -- I think we're all pretty surprised it's August,

22   2009 already -- when December, 2009 comes along, we'll also be

23   surprised how quickly that came around, that there's a

24   likelihood that there may be things that the defendant raises

25   in its opposition brief or that did not come to light during

Sobol - Argument                              Page 12

1    discovery on impact and damages that might be material to

2    raise, not by way of sandbagging, but simply by way of good

3    faith -- this is what came up on, or this is what you decided

4    after the fact.

5           The defendants I think want a hard and fast rule that

6    when we file our reply brief there's certain information

7    that's not fair game for us to be sticking in there, and that

8    we should make that decision now, for sure, as a -- you know,

9    a line in the sand, rather than looking at it essentially for

10   good cause shown at that time later on.

11          And that's really I think -- I think that issue in

12   terms of as a tempest in the teapot, but I do think that the

13   parties and the Court ought to be aware that their class

14   certification nowadays is a highly -- fact driven in the sense

15   that it requires on the part of the litigants and the Court a

16   significant exposition as to why it is that the requirements

17   are met in the way that have not historically been the case.

18          THE COURT:  Yes, no, no, no, I'm familiar with

19   Hydrogen Peroxide and all of those cases.  But I guess my

20   question to you was though, Mr. Sobol, putting aside for the

21   moment whether assuming we're going to stop -- if the

22   defendants succeed in their argument that at some point class

23   discovery should stop -- I understand your point, well, but

24   you want it to continue past the filing of the defendant's

25   opposition because something may come up and you may need to

Sobol - Argument                          Page 13

1    do some additional discovery on it, and I can understand that

2    and I'll hear from Mr. Royall on it.

3            But I guess my question to you is why do you need to

4    continue with class discovery once all of the briefing is done

5    on the class cert motion?

6            MR. SOBOL:  Sure.  That would not be necessary under

7    the banner of class certification discovery, but there's no

8    issue that we wouldn't be discovering in any event, like

9    impact or damages, that will continue.  To put it differently,

10   if there's a -- if there's an order that says the plaintiff's

11   are not permitted to do class certification discovery after a

12   certain point, the question is well what would that -- what

13   would that exclude --

14           THE COURT:  No, I agree --

15           MR. SOBOL:  -- by way of discovery, and I think

16   the --

17           THE COURT:  -- and that's why the whole --

18           MR. SOBOL:  -- and I think the answer to that will be

19   pretty much it doesn't -- I'm sorry, I didn't mean to

20   interrupt you, Your Honor -- I just -- I think that it's a

21   null set.  It doesn't exclude anything because you still have

22   the issues of impact and damages that survive, which are the

23   critical class certification issues anyway.

24           But, they're also liability issues.  So, those will

25   continue, therefore it's a null set to say no more class

Royal - Argument                    Page 14

1    certification discovery.  It doesn't exclude anything is my

2    point.

3         THE COURT:  Well, it may or may not.  I don't know.

4    Mr. Royall, what my question -- what I'm trying to get at is

5    in view of the fact that you have conceded as I understand it

6    that you don't want to have it bifurcated, and of course it's

7    very difficult often.

8         I mean, when -- and again, in the old days when we

9    used to have well, we're going to do class discovery now and

10   not merits, it was just always on the telephone -- what's

11   class, what's merits, so I'm delighted that you're not going

12   to try to make that argument that you want to bifurcate.

13        But putting that a little further, is there really

14   going to be a lot of discovery that will be purely class that

15   you think should end, or -- you know, is Mr. Sobol correct

16   that really it's -- it's just all discovery so why make a

17   ruling that it's going to end at any given time?

18        MR. ROYALL:  Well, thank you, Your Honor.  I'm not

19   sure I understand Mr. Sobol's argument, to be honest.  It

20   seems to me that yes, this is a fact based inquiry, as is true

21   of summary judgment and many other types of motions and but in

22   that context as well, it's important to have a record and some

23   finality so we understand that we have a body of -- of

24   evidence to draw from and that we can present and make

25   arguments to the Court.

1          As in summary judgment, it seems to me that this
2    should be no different and that there should be a cutoff so
3    that we can get what discovery is needed.  I do think that
4    there is some discovery that is probably uniquely relevant to
5    class certification that both sides will want to do and I
6    think it's --
7          THE COURT:  Can you give me an example?
8          MR. ROYALL:  I think there will be discovery relating
9    to distribution issues that may -- I'm not saying it won't
10   have relevance to -- to other issues in the case, liability
11   issues, but it will be relevant to class cert.
12         There will be disparate or the typicality of
13   arguments that are being made on behalf of the class and the
14   adequacy of class representative -- just the normal class
15   certification type issues where there may be some unique
16   discovery that will need to be done relating to that.
17         Having class cert discovery close so that we have a
18   final record by no means prejudices the plaintiffs or either
19   side from continuing to do fact discovery relating to the --
20   the merits.
21         THE COURT:  Well but suppose in your opposition brief
22   you make a presentation, and I'm sure that with this quality
23   of plaintiff's counsel they will be foreseeing exactly what
24   you're going to be doing pretty much, but suppose something
25   pops up that perhaps they didn't expect and so they need to do

1    some fact discovery on it.  As long as you're not prejudiced

2    in terms of being able to respond to it perhaps or something,

3    is there any reason why they shouldn't be able to do it?

4                MR. ROYALL:  Is this -- would this -- is your

5    hypothetical after the close of briefing or --

6                THE COURT:  No, no, no -- well, it's after your

7    brief, after your opposition brief --

8                MR. ROYALL:  After our brief?

9                THE COURT:  -- before their reply brief.

10               MR. ROYALL:  As long as we're not prejudiced, I don't

11   think I can say that that's something that we would have

12   reason to complain of, but it could prolong -- it could cause

13   -- it could create a situation where we feel like the only way

14   that we are not prejudiced is if we have an opportunity to

15   file some sort of sir opposition or additional supplement to

16   our opposition to deal with new issues that have been raised

17   that were not raised in their motion or new facts that had

18   been developed.

19               And so it could get complicated in that sense and so

20   I think just from the simple standpoint of just trying to have

21   a finite record and trying to be as streamlined as possible

22   with the process, that's really what we had in mind.  But if

23   there are unique situations that come up and obviously we will

24   not oppose any reasonable requests for supplemental discovery

25   if we're not going to be prejudiced and then I don't think

Colloquy                                    Page 17

1   that there's anything that could preclude plaintiffs from

2   seeking that if there was a good justification for it.

3        THE COURT:  Mr. Sobol, let me ask you, if I were to

4   say let's aim for class discovery ending -- let me refresh

5   myself on what these dates are -- that class discovery will

6   end a week before whatever the date is that I pick for the

7   defendant's opposition, however, if in seeing the defendant's

8   opposition the plaintiffs feel that they need certain

9   additional discovery, they should discuss it with the

10  defendants.

11       If the defendants have a problem, just write me a

12  letter and if I believe that you do need it, then you'll get

13  it, and if the defendants then need a little something more in

14  terms of just responding to that one point, that -- you know,

15  I would allow them to do the same thing.  Would that solve

16  whatever the concern you have is?

17       MR. SOBOL:  I think it would.

18       THE COURT:  Okay.

19       MR. SOBOL:  I think it would.  I mean, I think there

20  are two situations that might arise.  One is the defendants

21  raise an issue which we hadn't anticipated -- I would hope

22  that that wouldn't be the case.  The second issue might be

23  that just in the course of discovery, the parties learn about

24  something that they hadn't appreciated before reasonably.

25       THE COURT:  Yes, that's true, sure.

```
                    Colloquy                      Page 18
 1          MR. SOBOL:  But so -- yeah.
 2          THE COURT:  Sure, yes, because if discovery is going
 3     to end a week before the defendant's brief, then something
 4     could happen that last week and you need to do something more
 5     on it.  Yes, I think all of -- not all of these issues, but a
 6     lot of these issues can be dealt with as long as people are
 7     reasonable and talking to each other.
 8          And I'm always here.  You can just -- you don't have
 9     to file a motion, you can just drop me a letter.  And if
10     there's an issue, that's what I'm tending to do.  I mean, I'm
11     still though thinking that I hope we don't have a lot of
12     battles later on what's class and what's merits because -- you
13     know, sometimes you just spin your wheels so much on that
14     point.
15          That's why I asked you what would it be, because I
16     was trying to think of what there might be two months after my
17     decision on class cert, assuming facts -- fact discovery is
18     still going on, that somebody would -- that you would need,
19     Mr. Sobol, what discovery that is really purely class, you
20     would need after for example oral argument on the class cert
21     motion.
22          I can't imagine that there would be any because if I
23     do grant the motion for class cert, you'd like the whole thing
24     to be quiet.  You don't want any motions to decertify or
25     anything.  If I deny it, I deny it.  I mean -- you know, so
```

Tessar - Argument                               Page 19

1     I'm not sure why we would need purely class discovery.  Okay,

2     well in principle then we still have to talk about dates, we

3     still have to talk about dates.  In principle, that's what

4     we'll do.  And I didn't mean to ignore GSK.  Who's speaking

5     for GSK?

6                 MR. STADNICK:  Mike Stadnick, Your Honor.

7                 THE COURT:  Okay, sir.  Mr. Stadnick, did you have

8     any objection to that?

9                 MR. STADNICK:  No, Your Honor.  I think that the

10    resolution you arrived at is perfectly acceptable to GSK.

11                THE COURT:  Okay.  Thank you very much.  All right,

12    so that's the class versus merits discovery.  Then we have

13    requested initial disclosures.  I know we were going to meet

14    in June.  Have the defendants filed their opposition -- not

15    opposition -- their response to Rule 34 -- to the Rule 34

16    requests?

17                MS. TESSAR:  Yes, Your Honor, we have.

18                THE COURT:  Okay.  So you were saying let's at least

19    wait for that.  Now, did you not object to anything and you're

20    going to give them all the documents?

21                MS. TESSAR:  Well, not quite --

22                THE COURT:  That was just a joke --

23                MS. TESSAR:  -- because they did ask for quite a

24    broad scope.

25                THE COURT:  -- if you don't know me, I should smile

Tessar - Argument                          Page 20

1    because I -- people might think I'm -- I'm just joking in a

2    case like this.  In fact, in a little case there's never a

3    time when one party says sure, here, take it.  But I'm sorry,

4    ma'am, go ahead, tell me, where are you?

5           MS. TESSAR:  Well, I mean, obviously their request

6    for production, there were something like 75 of them that

7    spanned a huge range of documents.  I think that the

8    plaintiffs -- I'll let them speak for themselves -- but I

9    think their most pressing concern in the underlying litigation

10   record documents --

11          THE COURT:  Sure.

12          MS. TESSAR:  -- and that's the dispute that's framed

13   in these papers -- the Rule 26(f) Report.  And the issue from

14   our perspective is really one of the complexity of the record.

15   I'm not sure how familiar you are with it, but their -- the

16   plaintiff's allegations here relate to something like five

17   litigations that started in 2004.  The last one ended last

18   year in 2008.  There were multiple law firms involved for

19   Biovail.

20          GSK was involved in many of the suits and had law

21   firms involved and the requests for the underlying litigation

22   documents implicate a lot -- a lot of materials that are third

23   party -- have third party confidential information.

24          THE COURT:  Right.

25          MS. TESSAR:  So obviously, in each of the underlying

1    cases, there were protective orders in place and those

2    protective orders limited who at Biovail could see materials

3    and what outside counsel and in house counsel could do with

4    the materials so they could only be used for purposes of those

5    cases, they could -- you know, not be produced necessarily

6    just because in a separate case someone made a document

7    request.

8           So where we are at right now is Biovail has notified

9    all of the generic companies that were defendants in the

10   underlying lawsuits that these materials have been requested,

11   have asked for consent to produce the materials, and the

12   generic companies that have responded to us have all refused

13   that consent.

14          And so as things stand now, we cannot give the

15   plaintiffs the materials they request or the majority of the

16   materials they request without violating separate protective

17   orders.

18          THE COURT:  Okay.  Okay, let me -- yes, sir, and

19   don't tell me, don't tell me who you are, I'm going to get it.

20   You are -- wait a minute -- Mr. Kohn.

21          MR. KOHN:  Yes, Your Honor.

22          THE COURT:  Oh, good.

23          MR. KOHN:  I am Mr. Kohn.

24          THE COURT:  Okay, go ahead.

25          MR. KOHN:  For the Direct Purchaser Plaintiffs.  Your

Kohn - Argument                          Page 22

1    Honor, I was listening to Ms. Tessar's recitation of events

2    and I'm -- we're gratified to learn that Biovail and I presume

3    GSK have put the producing parties in those cases on notice

4    because they are required to by the protective orders that

5    were entered in those four cases, and those protective orders

6    are attached as Exhibits B-1 through 4 to the 26(f) Report,

7    and I'll get into those in just a moment.

8         The -- there's no dispute that I heard that Biovail

9    and GSK have the documents or have access to the documents

10   that we have requested in our Rule 34 requests and I've heard

11   no issue that we have served our requests improperly.  What

12   I've heard is that although they followed the procedures and

13   notified the generics, there's somehow some impediment to

14   their producing these materials.

15        And we have been through the four protective orders

16   in the underlying cases and we can see no impediment.  And in

17   fact, Your Honor, if Your Honor wants to turn to those -- or I

18   have a demonstrative that's very simple that will point Your

19   Honor --

20             THE COURT:  Sure, go ahead.

21             MR. KOHN:  May I approach?

22             THE COURT:  Sure, absolutely.  Yes, and you can --

23   why don't you just go stand at the podium, Mr. Kohn?

24             MR. KOHN:  Sure.

25             THE COURT:  Thank you.

1        MR. KOHN:  I have extracted, Your Honor, the

2   pertinent provisions of protective orders and I'll let Your

3   Honor know preliminarily that we have entered a protective

4   order in this case and if you look at -- I think Your Honor

5   has stated her intent to sign it --

6        THE COURT:  Right.

7        MR. KOHN:  -- if you look at paragraph 3-D of the

8   proposed protective order in this case, it already

9   contemplates the production of the materials in the underlying

10  patent litigations in this case.  In fact, counsel for Biovail

11  suggested paragraph 3-D.

12       So, everything that will be produced from the

13  underlying patent litigations in this case will be highly

14  confidential.  Now, let's take a look at the underlying

15  protective orders in the patent cases.  There's no consent

16  provision.  Biovail and GSK simply have to, as they say they

17  did, give notice to the producing parties.

18       And then you'll see later in the first paragraph --

19  paragraph 5 of the Abrika -- A-B-R-I-K-A protective order, "It

20  shall be the responsibility of the party who produced the

21  confidential material to intervene and respond," meaning that

22  they come to Your Honor if they have an objection, and

23  obviously they do not because there has been a notification of

24  these parties by Biovail and by GSK and there has been no

25  action before Your Honor.

1            THE COURT:  Well, let's just find out what's going

2       on.  Is it Ms. Tessar?

3            MR. STADNICK:  Your Honor, if I could speak on behalf

4       of GSK?

5            THE COURT:  Absolutely, absolutely.  I just want to

6       make sure I have Ms. Tessar -- yes, go ahead, Mr. Stadnick, go

7       ahead.

8            MR. STADNICK:  I just need to correct something that

9       Mr. Kohn said.

10           THE COURT:  Yes.

11           MR. STADNICK:  GSK is in fact slightly differently

12      situated than Biovail is in this regard and to the extent that

13      Mr. Kohn is making the assumption that GSK has these documents

14      and has made requests for the production, I'm not sure that's

15      accurate.

16           As Your Honor may recall, GSK's participation in the

17      underlying patent litigations was very limited.  We're not a

18      signator to the underlying protective orders with exception to

19      the Watson protective order, and my understanding based on

20      investigation to date is our participation in discovery in the

21      underlying patent litigations was strictly on the producing

22      side.

23           So to the extent that we have documents related to

24      the underlying litigation, there's documents that we collected

25      and produced, I'm not sure that we have any documents that

Stadnick - Argument                          Page 25

1  would raise their party confidentiality concerns.  I just want

2  to make sure that the record is clear that by being silent,

3  I'm not acceding to your implication that we have these

4  documents and --

5         MR. KOHN:  In that event, Your Honor, we'd expect

6  prompt production of the documents from GSK.

7         THE COURT:  Well --

8         MR. STADNICK:  We are in the process of --

9         THE COURT:  Yes?

10        MR. STADNICK:  The issue from GSK's perspective to be

11 frank, Your Honor, has been more a logistical issue of

12 tracking down the attorneys who represented GSK --

13        THE COURT:  Right.

14        MR. STADNICK:  -- in the former litigation who aren't

15 parties to this case, who are former counsel for GSK, many of

16 whom have left the law firms at which they resided when they

17 were representing GSK so it's been a bit of a logistical

18 problem in tracking down the documents.  We're in the process

19 of doing that and hope to be able to start producing them in

20 the next couple of weeks.

21        THE COURT:  Okay.  All right.  And, Ms. Tessar, now

22 I'm looking at this piece of paper that Mr. Kohn just gave me

23 and what is your understanding of what should go on here?

24 You've given them prompt actual written notice by hand or

25 facsimile.  They have told you that they object --

Tessar - Argument                              Page 26

1              MS. TESSAR:  So hold on a little bit because first of

2      all, I want to take a step back and address something that Mr.

3      Kohn said because he said that there's no dispute that Biovail

4      has the documents and I think the use of the word Biovail

5      there is a little bit confusing because outside counsel in the

6      patent litigations has the confidential documents.

7              In some cases, the generic companies have consented

8      that anti-trust outside counsel can have them, but in many

9      cases, they have not.  And so, in fact, when you say Biovail

10     has them, the outside former -- outside patent counsel has

11     them.

12             THE COURT:  No, I understand that and I'm sure Mr.

13     Kohn says that too but you have -- but Biovail has the right

14     to get them because it's their outside counsel.

15             MS. TESSAR:  Okay.

16             THE COURT:  That's what --

17             MS. TESSAR:  So then moving on --

18             THE COURT:  That's what he means.

19             MS. TESSAR:  -- moving onto the protective orders,

20     each of the protective orders is different --

21             THE COURT:  Okay.

22             MS. TESSAR:  -- so what's happened in each --

23     obviously each defendant from the underlying cases is

24     different, so what's happened in each case is a little bit

25     different.  So if we're to walk through, the first two

Colloquy                                    Page 27

1   paragraphs listed here are actually very similar.  Those are

2   from the Abrika and Watson protective orders, so we have given

3   Abrika and Watson notice.  Abrika did not respond but we've

4   made previous attempts to contact Abrika so that we -- outside

5   anti-trust counsel -- could access the documents in question

6   and they refused in the past.  So as things stand now, we at

7   Gibson Dunn cannot access those documents.

8            THE COURT:  No, I understand that.  But the question

9   is, you've given Abrika -- if that's how you say their name --

10  prompt actual written notice.  What is your understanding that

11  they have to do under this because it does say, as Mr. Kohn

12  said, "responsibility of the party who produced the

13  confidential material to intervene and respond."  It doesn't

14  say when though.  Usually it says within a certain amount of

15  days, these things, don't they?

16           MR. KOHN:  This actually did not provide for that.

17  Biovail and Abrika were parties to this particular protective

18  order --

19           THE COURT:  No, I know.

20           MR. KOHN:  -- and in fact, they drafted it.

21           THE COURT:  Yes.

22           MR. KOHN:  And because their has been and I don't

23  know when --

24           THE COURT:  Yes.

25           MR. KOHN:  -- notice was given -- maybe Ms. Tessar

Colloquy                               Page 28

1    can inform the Court of that --

2          THE COURT:  Right.

3          MR. KOHN:  -- but given that there has been no

4    intervention or objection by Abrika before this Court within

5    the meaning of paragraph five of this protective order,

6    there's no impediment to Biovail for producing those

7    documents, would be our position.

8          THE COURT:  I understand, Mr. Kohn, but -- you know,

9    I'm not going to say give it -- are they out there, give it to

10   them right now.  We're not going to do that.  But I just want

11   to understand, Ms. Tessar, what -- what is your understanding

12   with respect to Abrika, just taking Abrika for a moment.

13         Because looking at this, it doesn't say when they're

14   supposed to come in.  Have they told you they're going to come

15   in?  I mean, if they're going to come in, obviously I will let

16   them come in at some point.  Do you know what they want to do?

17         MS. TESSAR:  We do not.

18         THE COURT:  Okay.

19         MS. TESSAR:  And that's kind of the dilemma from our

20   perspective because we still have the other protective order

21   binding Biovail and so at this point it becomes a little bit

22   of a rock in a hard place.

23         THE COURT:  What's the other one?  You mean this one

24   with Abrika?

25         MS. TESSAR:  Exactly.

Colloquy                              Page 29

1        THE COURT:  Yes.  No, no, no, I understand, but what

2   it says is "If any party is subpoenaed, is served with a

3   demand to which it is a party," okay -- and that's you, right,

4   Biovail, "that shall give prompt actual written notice to

5   those who produced or designated the information material,

6   confidential," et cetera, and that is Abrika --

7        MS. TESSAR:  Yes.

8        THE COURT:  -- "and shall object to its production by

9   setting forth the existence of this protective order," and

10  you've done all that.

11       MS. TESSAR:  That's correct.

12       THE COURT:  Okay.  "Should the person seeking access

13  to the information or material" -- "should the person seeking

14  access to this information" -- that's you I guess, Mr. Kohn --

15       MR. KOHN:  Yes, Your Honor.

16       THE COURT:  -- "take action against the party or

17  anyone else covered by this protective order to enforce, it

18  shall be" -- oh, well you haven't done that yet so I guess

19  that means you have to do a motion to compel or something.

20       MR. KOHN:  Your Honor, it was our hope that by

21  pressing Biovail for these documents we would be complying

22  with that paragraph and by appearing before Your Honor and

23  insisting on that production, and in doing so in the context

24  of the 26(f) Report, we would have complied with that.  But if

25  Your Honor wants us to file a Rule 37 motion, we believe one

1    is ripe and would do so forthwith.

2          THE COURT:  Yes, yes, sure.  Well see I think that's

3    what triggers this so as I -- it doesn't say should -- well,

4    it says "Should the person seeking access to this information"

5    -- blah, blah, blah, blah, blah -- "take action against the

6    party" -- that's Biovail -- "to enforce the demand, then it

7    shall be the responsibility of the party who produced to

8    intervene and respond."

9          You haven't done that yet.  I assume when you do

10   that, Ms. Tessar will ship that motion to compel over to

11   Abrika and they will have to intervene in they want to object.

12         MS. TESSAR:  And I would actually propose that the

13   plaintiffs serve Abrika because we really do see this as being

14   a dispute between the plaintiffs and Abrika so that would be

15   my suggestion.

16         THE COURT:  Sure, okay, well that's no harm.

17         MR. KOHN:  Your Honor --

18         THE COURT:  Yes.

19         MR. KOHN:  -- this is our Rule 34 requests that are

20   served --

21         THE COURT:  Right.

22         MR. KOHN:  -- to Biovail and although we're happy to

23   do anything that makes it easier --

24         THE COURT:  Right.

25         MR. KOHN:  -- for the Court and the parties, there

Colloquy                              Page 31

1   could be third parties that Ms. Tessar has not referenced that

2   were producing parties in the case that Biovail brought

3   against Abrika.  We don't know who --

4            THE COURT:  Right.

5            MR. KOHN:  -- those entities are.  Biovail has never

6   seen fit to inform us --

7            THE COURT:  Right.

8            MR. KOHN:  -- who the producing parties are --

9            THE COURT:  Okay, well clearly if -- look, I don't

10  mean to cut you off but honestly, this is a practical problem.

11  We can get through this.  This is not -- you know, obviously

12  you're going to get the documents.  At some point under some

13  circumstances, you're going to have to get them.

14           So the question is what's the simplest way to do it

15  within the confines of this, and in fairness to Abrika, they

16  haven't been served with something that triggers to them that

17  they need to come in.  So go ahead, Ms. Tessar.

18           MS. TESSAR:  And I was just going to say that the

19  same -- because the provision in paragraph five of the Watson

20  protective order is so similar, that I assume we'd take the

21  same approach for Watson.

22           THE COURT:  Yes.  I haven't -- I haven't looked at it

23  carefully but if it says the same thing, that seems to me to

24  be -- now, "It shall be the responsibility of the party who

25  produced the confidential material to intervene and respond."

Colloquy                                    Page 32

1    So I infer from that that if there's a motion to compel,

2    there's a certain time period for motions and that Abrika will

3    understand that they're going to have to come in, even if Ms.

4    Tessar doesn't tell them that, that they're going to have to

5    come in within the time frame of the rules, unless they ask me

6    for a continuance to intervene and respond.

7              Okay, well that's not going to be that hard.  That's

8    fine.  Okay, they'll come in if they want to.  If they don't,

9    we'll -- you know, we'll take action.  Mr. -- yes?

10             MR. KOHN:  We will therefore file, Your Honor, Rule

11   37 motions as to Biovail with regard to the documents in the

12   Abrika and Watson cases.  That leaves the Anchen and IMPAX

13   cases --

14             THE COURT:  Okay, before you get there, sir, Mr.

15   Royall, and you didn't see him but he was standing up to

16   speak.

17             MR. KOHN:  Oh, I'm sorry.

18             MR. ROYALL:  That's okay.

19             THE COURT:  That's okay.  Go ahead.

20             MR. ROYALL:  Just in response to your --

21             THE COURT:  Yes.

22             MR. ROYALL:  -- point, Your Honor, about whether we

23   or Ms. Tessar would advise Abrika and Watson, we certainly

24   will advise them by letter of this conference and Your Honor's

25   statements and rulings so that they'll be aware of the

Colloquy                              Page 33

1    situation and can promptly respond.

2            THE COURT:  Okay, I appreciate that.  That's great.

3    Yes, and if they have a problem, obviously we're not going to

4    cut off anybody's rights prematurely.  Everybody will have a

5    right to be heard before I would make any ruling.  But in any

6    event, okay, Ms. Tessar, anything of Abrika and Watson before

7    I hear from Mr. Kohn Anchen?

8            MS. TESSAR:  No, Your Honor.

9            THE COURT:  Okay.  I haven't read that one as yet.

10   Why don't you walk me through that, Mr. Kohn.

11           MR. KOHN:  Your Honor, Anchen's a little bit

12   different.  Anchen, paragraph 15, simply says that "Production

13   of any confidential material by" -- and there's a missing "a"

14   there -- "non-producing party is response to an apparently

15   lawful subpoena, motion or order of Court or other

16   Governmental agency shall not be deemed violation of any of

17   the terms of this order," meaning our Rule 34 request to

18   Biovail and Biovail's response to those Rule 34 requests is

19   not a violation of the terms of the underlying protective

20   order in the Anchen case.

21           However, and just like the other two orders, Biovail

22   has to notify the producing party, if there's enough time to

23   do so, and give the producing party the opportunity to secure

24   confidential treatment in this case of the documents that had

25   been produced in the underlying Anchen case.

Colloquy                                    Page 34

1          THE COURT:  Okay, go ahead.

2          MR. KOHN:  And I would tell Your Honor that through

3    cooperation with counsel for Biovail and counsel from GSK,

4    paragraph -- I think it's 3-D of the protective order that

5    Your Honor is expected to enter in this case affords all

6    documents in the underlying patent cases, irrespective of the

7    designation of those documents in the underlying patent cases

8    to be afforded highly confidential treatment --

9          THE COURT:  Okay.

10          MR. KOHN:  -- in this case.

11          THE COURT:  Okay, fair enough.

12          MR. KOHN:  So I -- we don't think there's any

13    impediment to Biovail's production of any of the documents,

14    irrespective of the identity of the producing party that were

15    exchanged in the Anchen case to be produced in this case.

16          THE COURT:  Okay.  And, Ms. Tessar, do you know what

17    the story is with Anchen?

18          MS. TESSAR:  I do, Your Honor.  So two points.

19    First, I don't believe that we've had a subpoena, motion or

20    order here so I don't believe that the provisions of paragraph

21    15 have kicked in.

22          But even setting that point aside, we did notify

23    Anchen of the document requests and Anchen did send us a

24    letter refusing to permit us to produce any of the documents

25    and specifically objecting to the fact that the protective

Colloquy                                    Page 35

1    order that has been stipulated to in this anti-trust case is

2    less restrictive than the protective order that was entered in

3    the Anchen case and that's mostly with respect to access by in

4    house attorneys, things of that nature.

5             THE COURT:  Now, did -- all right, a couple of

6    things.  Mr. Kohn, what about the apparently lawful subpoena,

7    motion or order?

8             MR. KOHN:  We think that the Rule 34 requests that we

9    served in this case are the equivalent of a Rule 34 -- Rule 45

10   subpoena.  It would be improper for us to serve a Rule 45

11   subpoena on Biovail --

12            THE COURT:  Of course.

13            MR. KOHN:  -- because they're a party.

14            THE COURT:  Of course.

15            MR. KOHN:  So we believe that we have complied with

16   whatever trigger is necessary and by the fact that they

17   notified and felt it appropriate to notify Anchen, I think

18   that Biovail probably wouldn't disagree.  However, if the

19   Court would like us to file a Rule 37 motion against Biovail

20   as to the Anchen documents, we'll do so forthwith.

21            THE COURT:  Okay.  Let me read this.

22            (Pause in proceedings)

23            THE COURT:  Okay, why don't you just -- well, let's

24   make it sort it easier and let's -- if we can do them all

25   uniformly without violating the order, let's do it that way.

Colloquy                                          Page 36

1    And since we have two that require a motion, why don't you do

2    a motion on Anchen as well and then I think probably what I'll

3    do is on getting -- especially with Anchen -- maybe with all

4    of them, let me think about it, but what I might do is when I

5    get your motions, do an order saying where as I've got the

6    motion, whereas I know there are these orders -- Anchen,

7    Abrika, Watson, et cetera, shall follow this procedure.

8           Okay, I think probably that might make it easier and

9    then everybody will know what the dates are so that we don't

10   have a situation where somebody's running in to have me vacate

11   an order or something.  Okay, now what about IMPAX?  Is that

12   any different, Mr. Kohn?

13          MR. KOHN:  IMPAX, Your Honor, I think the procedure

14   Your Honor has prescribed is fine for IMPAX.  IMPAX is a

15   little bit different from the other three.  What I have

16   reproduced here is what I think would be an appropriate way to

17   go with regard to IMPAX.  The IMPAX order doesn't provide the

18   procedure that is to be followed when there is a request by a

19   non-party such as the plaintiffs in this case to get the

20   documents from that case.

21          THE COURT:  All right.

22          MR. KOHN:  However, I noticed that there was this

23   paragraph 15 in the IMPAX case where in the event of an

24   inadvertent production of documents and it says "or

25   otherwise," perhaps that contemplates the situation, all the

Colloquy                                          Page 37

1    plaintiffs need to do is agree to be bound by the underlying

2    protective order in the IMPAX case, which was before Judge

3    Brody.

4              THE COURT:  All right.

5              MR. KOHN:  And we could go that route.

6              THE COURT:  Let me get Ms. Tessar's views of it.

7    Yes, ma'am?

8              MS. TESSAR:  We see this IMPAX protective order as

9    actually being the most complicated one to handle because

10   there is no express provision for how you handle these

11   situations where discovery of the documents are sought, and

12   this is kind of the first we've really heard that the

13   plaintiffs were considering this paragraph 15 --

14             THE COURT:  I don't construe it to cover this --

15             MS. TESSAR:  Exactly.

16             THE COURT:  It's not for this.  We'll have to think

17   up a different way though.  Go ahead.

18             MS. TESSAR:  And so I think that -- you know, in

19   order to set this up so that Biovail wouldn't be violating an

20   underlying protective order, I think realistically what has to

21   happen is that the plaintiffs have to go back to Judge Brody

22   and seek to have the protective order modified in some way in

23   that context, because otherwise Biovail is simply between the

24   rock and the hard place --

25             THE COURT:  Right.

Colloquy                                    Page 38

1          MS. TESSAR:  -- of Judge Brody's orders and yours.

2          THE COURT:  Is there any objection to my asking Judge

3     Brody, assuming that I get a Rule 37 motion on this, I can ask

4     Judge Brody to -- let me think about what the terminology

5     would be but to -- you know, issue an order telling them --

6     them being IMPAX, to come in and let her know if there's any

7     objection to her modifying the order to -- so that they can be

8     produced.  Does that make sense, Ms. Tessar?

9          MS. TESSAR:  Yeah.

10         THE COURT:  Okay.

11         MS. TESSAR:  We have no objection to any of that.

12         THE COURT:  Okay.

13         MS. TESSAR:  Also, I mean, I would just note for the

14    record that in past cases that we've handled of this nature,

15    the plaintiffs have gone to the generic companies and sought

16    consent and sometimes got them, and so that may be a simpler

17    way to proceed, and sometimes they're more able to convince

18    the generic companies to consent than we at Biovail are.

19         THE COURT:  That's a fair point, but I assume Mr.

20    Kohn knows that already and maybe he doesn't want to or tried

21    and they said no.

22         MR. KOHN:  Well -- you know, we haven't actually

23    tried and there's one reason that we haven't tried and I think

24    Ms. Tessar has let you know that at least one of the companies

25    has said that they would refuse --

Colloquy                                    Page 39

1       THE COURT:  But maybe you could convince them is what

2   she's saying.

3       MR. KOHN:  In my experience --

4       THE COURT:  Maybe they'll like you better --

5       MR. KOHN:  Well, that hasn't --

6       THE COURT:  -- than they like Biovail.

7       MR. KOHN:  -- that hasn't been --

8       THE COURT:  Not that Ms. Tessar -- I didn't mean you

9   personally, I meant --

10      MR. KOHN:  That has not been my experience and --

11      THE COURT:  Okay, well we can do it this way.  I'm

12  not going to --

13      MR. KOHN:  Yes.

14      THE COURT:  -- I'm not going to pressure you to do

15  that.  I mean, I'm sure you want to get the job done as

16  quickly as possible, so if you thought it was productive or

17  would be productive you would do it.  So I won't press that.

18  They obviously feel they -- that that's not a route to go.

19      Yes, Mr. Stadnick?

20      MR. STADNICK:  Thank you, Your Honor.  I just would

21  like to point out that in connection particularly with any

22  modification of the IMPAX protective order, it would also have

23  to be modified so that GSK could have access to the documents

24  as well since we don't have the productions and we'll have to

25  work with plaintiff's counsel and the counsel for Biovail to

Colloquy                              Page 40

1   figure out how to get copies of the other productions also as

2   well.

3          THE COURT:  Oh sure, yes, well I mean all the parties

4   will of course have to have access to everything, yes,

5   absolutely.  Okay.  Ms. Tessar, anything else on just this

6   issue of the prior lawsuits and how we can set forth -- you

7   know, get in place a procedure at least to get things moving?

8          MS. TESSAR:  Nothing further from me, Your Honor.

9          THE COURT:  Okay, all right.  Now, that's the -- that

10  was one of your main problems on the Rule 34 production.

11  Otherwise, I assume that you all -- is there a committee on

12  this plaintiff's side or something to work -- who's working

13  with Biovail and GSK to negotiate discovery disputes?

14         MR. SOBOL:  Well, we have a group on our side and

15  they have a group on theirs.

16         THE COURT:  Okay, all right, that's fine.  So I

17  assume with respect to everything else, and I don't know how

18  much there is that's not impacted by these agreements, you'll

19  just work it through as you always do and I assume you'll be

20  able to work things through.

21         And once, assuming -- again, I'm assuming -- I'm

22  completely open to any argument obviously that IMPAX, Anchen,

23  et cetera, will make to me but assuming for the moment that

24  those materials do get produced, in terms of timing and the

25  like, I expect that everybody will work together so that --

Colloquy                                    Page 41

1    you know, and at this point I don't want to say anything about

2    what timing is because we don't even know as yet what will be

3    going on.  Okay, so that's that.

4            Now, is there anything else then on this topic in

5    your report that's entitled -- where is it, what's the title

6    -- Requested Initial Disclosures -- anything more on that

7    front?  No?

8            MR. SOBOL:  No, there isn't, Your Honor.

9            THE COURT:  Okay.

10           MR. SOBOL:  When we get to scheduling, we might

11   discuss briefing regarding this Rule 37 motion --

12           THE COURT:  Sure.

13           MR. SOBOL:  -- but let's deal that when we get to

14   scheduling.

15           THE COURT:  Absolutely, absolutely.  Now, bear with

16   me for one second.  Okay, now the form of document production

17   -- ESI issues, that's fine, you've told me you're talking

18   about that number of requests, that's fine.  You'll work

19   through that.  And then this advice of counsel -- you know,

20   how does it work under PRE (Phonetic)?

21           Mr. Roda, how does advice of counsel come in?  You've

22   got the two part definition of sham litigation, objectively

23   baseless, and then you've got the subjective part of it.  Just

24   -- you know, educate me a little bit.  How does advice of

25   counsel come in in this?

Roda - Argument                                    Page 42

1          MR. RODA:  We think it comes in on both issues, Your

2     Honor.  We think that if one were the defendant --

3          THE COURT:  Yes.

4          MR. RODA:  -- you would want the jury to know that as

5     a responsible entity, you ran the decisions to file the

6     lawsuits, to participate in the lawsuits, or to file the

7     petition before your responsible ethical counsel before you

8     did it, you didn't just do this loosely --

9          THE COURT:  But will --

10         MR. RODA:  -- and that counsel would not let you file

11    an unreasonable --

12         THE COURT:  -- will that mean that -- right, but

13    would that mean -- you mean as evidence of the fact that it

14    was objectively reasonable --

15         MR. RODA:  Yes.

16         THE COURT:  -- because if counsel said it was okay,

17    then --

18         MR. RODA:  We're entitled to believe it.

19         THE COURT:  -- they -- the jury is entitled to

20    believe it.

21         MR. RODA:  And they -- the companies were entitled to

22    take the advice of their esteemed counsel.

23         THE COURT:  Even if otherwise it was objectively

24    unreasonable.

25         MR. RODA:  We would present evidence -- we think that

1    that is an arrow in the quiver that they would want to

2    present.

3              THE COURT:  So you're making -- okay, because

4    normally --

5              MR. RODA:  The --

6              THE COURT:  -- I would expect them to be telling me,

7    Judge, this is a great defense and we want to use it, but

8    you're expecting it --

9              MR. RODA:  We anticipate it.

10              THE COURT:  -- it comes up in these cases, is what

11    you're telling me.

12              MR. RODA:  We -- Your Honor, yes, and when you think

13    about what these issues -- the case involves the decision to

14    file lawsuits, the decision to file petitions.  It's very

15    reasonable to think that these were vetted by counsel and it

16    would be unreasonable to think otherwise.  The question is at

17    what point they invoke the advice of counsel decision because

18    that affects all the discovery.

19              It would be very unlikely to have discovery that

20    doesn't have something that -- a decision, a consultation, a

21    conference that was made that didn't include lawyers,

22    documents that weren't circulated or copied to lawyers or

23    authored, et cetera.

24              And if they should defer the decision to invoke that

25    defense, until we've done a lot of discovery, we come into you

Roda - Argument                                    Page 44

1    saying Your Honor, they -- that invocation waives the

2    privilege, we now have the right to go back and re-depose

3    everybody, reexplore the documents -- terribly inefficient.

4    We're talking here about the objectives of rule one -- just,

5    speedy and inexpensive determination of every action.  There

6    is no reason why that decision, are they going to invoke it or

7    aren't they going to invoke it can't be made at this juncture.

8         They know what they did.  It's not as if they have to

9    go into this case and find out facts that will let them make

10   the most educated decision on it.  They know.  The only thing

11   they don't know is how much we're going to find out about what

12   they did.

13        It is also important as a sub-issue in this, what

14   does invoking the advice of counsel mean.  Of course, we say

15   it can be done two ways.  One is the overt way -- we relied on

16   counsel.  The other is the subtle way -- you don't say that

17   but you tell the jury, we vetted this with this group, this

18   group included our attorneys -- our very good attorneys, the

19   group said it was okay to do it.

20        THE COURT:  Well, I can't imagine that I would let

21   the defendants do -- tell the jury that if they haven't given

22   you their non-privileged or their privileged materials.  I

23   mean --

24        MR. RODA:  That's -- Your Honor, then that addresses

25   one of our concerns in the case that ought to be clear early

Roda - Argument                              Page 45

1    on.  I mention that because in other cases like this, this

2    issue has not been addressed early -- through no fault of the

3    Court's.  It's one of these things -- it's something you live

4    and learn.

5              THE COURT:  Right.

6              MR. RODA:  And in the SR litigation, for example,

7    Wellbutrin SR which was before Judge Kauffman and now before

8    Judge Stengel, that issue is the subject of a motion in limine

9    as to what effect, if any, they'll be a preclusion of the

10   introduction of evidence.

11             What we're suggesting is that because the issue is

12   ripe, that it be decided now so that we can minimize and

13   indeed hopefully eliminate the need for any duplication later

14   on.  And we agreed that they shouldn't be able to have it both

15   ways, tell the jury that, but not let us see the underlying

16   documents.

17             We just think that it should be decided now and we

18   think really that's in fairness to everyone, not just to us

19   but to them because they will know as they make decision along

20   the case -- along the way to invoke it or not, what the

21   consequences will be.  If they know, as Your Honor just said,

22   no document, no evidence to the jury, that attorneys were

23   involved, then everybody's on the same page from the

24   beginning.

25             THE COURT:  Okay.

Royal - Argument                                   Page 46

1          MR. RODA:  We think it -- this should be established

2     now early on, rather than later on.

3          THE COURT:  Mr. Royall, what is your thinking on the

4     timing?  I mean, I'm not going to obviously have you do it

5     right this second, but what's your thought on what timing,

6     because we don't -- and I know you don't want to have people

7     re-deposed -- heavens, that would be --

8          MR. ROYALL:  No, Your Honor, certainly if that's

9     avoidable, it's something that I think everyone would like to

10    avoid.  A few thoughts on this.  One is as we cited in the

11    report, there is -- there's law and support for the

12    proposition that this is something that parties should not be

13    required to do earlier at the outset of discovery --

14         THE COURT:  No, I understand, and I'm not going to

15    make you do it but on this stuff -- you know, telling me about

16    the cases unless the Third Circuit or the Supreme Court has

17    said something to me --

18         MR. ROYALL:  Right.

19         THE COURT:  -- I really -- to me, it's practical, you

20    know, what's the practical reason for you not to do it --

21         MR. ROYALL:  Well --

22         THE COURT:  -- sooner rather than later --

23         MR. ROYALL:  Well, one point --

24         THE COURT:  Yes.

25         MR. ROYALL:  -- practical reason and just to

Roda - Argument                                    Page 47

1    elaborate a little bit on the situation which is not -- I

2    think customarily the defendants in a litigation that's been

3    going on for the time period that this litigation has would be

4    -- you know, if not fully possessed of the facts from their

5    perspective, certainly quite up to speed.  We don't have that

6    situation here.

7            We have not even been permitted to review the

8    pleadings in the underlying cases because they're chocked full

9    of confidential information from the generics, who have not

10   consented to us even seeing that in most cases.

11           And so we -- we're not -- we're not much ahead of the

12   plaintiffs in terms of having the understanding of the basic

13   factual record here and obviously, this is a very important

14   decision for any party to make, whether to make a decision to

15   rely on advice of counsel potentially with the waiver of some

16   scope.

17           And so that's something that we believe that we

18   should be able to consider carefully in light of the evidence

19   as it develops, in light of our assessment of other defenses

20   that may be available.  It's obviously a very significant

21   decision to make.  We have -- Mr. Roda suggested that this is

22   ripe now and I think suggested that we may know now whether we

23   intend to rely on such a defense and that is absolutely not

24   the case.

25           I don't think it's ripe.  I don't think we know and

1    it's something that we would have to carefully consider and

2    consult with our client with after again we know more about

3    what the facts are and what other defenses are available.

4              THE COURT:  Yes.  Yes, Mr. Roda, what about that?  I

5    mean, he -- counsel who is -- I mean, and when you talk about

6    well they know or Biovail knows, I mean, Biovail had outside

7    counsel on those cases and it wasn't Mr. Royall, so Mr. Royall

8    himself is not in a position probably at this point to give

9    advice to his client as to whether they should invoke it in

10   this case or not.

11             Isn't that a fair point in view of the fact that he

12   hasn't really seen the underlying documents yet?

13             MR. RODA:  If it is a matter of his getting up to

14   speed and if Your Honor believes that a reasonable period of

15   time for him to get up to speed is there, yes, but I wouldn't

16   think it to take that long for his client to say here's what

17   happened, here is who made these decisions, here is what the

18   lawyers told us, here's what we decided.

19             I mean, they have filed answers to this case.  I

20   would think that's the kind of information that could be given

21   pretty quickly to the counsel who's going to be representing

22   them.

23             THE COURT:  It's a real big strategic decision for

24   defendants.  They have to look at the documents.  What do the

25   documents say that they'll have to give up.  I mean, we all

1    know this -- you know, what's the whole package here of

2    decision making.  They have to know what the privileged

3    documents say, what their clients say, what are the other

4    defenses, how strong are they, so we -- I mean, it is -- it's

5    not an easy decision to make, I'm sure.  I mean, I've never

6    done sham litigation cases but I can't imagine it's an easy

7    decision.

8            So the question is when is it -- when should it be

9    made so that we don't have people having to be re-deposed, and

10   they're going to be, I take it, defense people who will have

11   to be re-deposed, right?

12           MR. RODA:  They would be, Your Honor --

13           THE COURT:  Yes.

14           MR. RODA:  -- and it's not just re-deposed, but it's

15   production of more documents --

16           THE COURT:  Sure, oh yes.

17           MR. RODA:  -- to go in and depose them.

18           THE COURT:  Absolutely.

19           MR. RODA:  We really have the danger of a lot of

20   duplication.

21           THE COURT:  Which I don't want to have, Mr. Royall,

22   and I don't want the plaintiffs to be -- you know, prejudiced

23   with all the extra costs and time and the like.  So what are

24   you thinking, Mr. Royall?  What's your -- do you have a

25   proposal to make?

1    MR. ROYALL:  Well, Your Honor, I certainly agree with

2    the comments that it is a complicated decision and we not only

3    would need to know some basic information from our client

4    about what lawyers said, we'd need to assess the case as a

5    whole before making --

6         THE COURT:  Sure.

7         MR. ROYALL:  -- this very consequential --

8         THE COURT:  Right.

9         MR. ROYALL:  -- decision.  What we were thinking as a

10   proposal would be a deadline that's six weeks before the close

11   of discovery and GSK may want to speak with their views

12   because this not something that vetted specifically with them,

13   but speaking for Biovail, something on the order of six weeks

14   we believe would be reasonable because in the event that that

15   did necessitate or open up reasonable requests for further

16   discovery by plaintiffs, there would be some additional time

17   for that.

18        And of course obviously if they feel that they're

19   prejudiced and don't have the time to get it done in six

20   weeks, they could raise that with the Court or raise it with

21   us.  But we think that that would be reasonable and I -- I

22   don't think that if there were -- one thing just to bear in

23   mind that we bear in mind, if there were to be a reliance on

24   advice of counsel here, it wouldn't necessarily cut across all

25   four of these cases, it wouldn't necessarily implicate every

Stadnick - Argument                    Page 51

1    witness by -- by no stretch, would it?

2           It may -- may be that a strategic decision would be

3    would be made where there's only one of the four cases say

4    potentially and there's only one lawyer or a couple of lawyers

5    who were involved.  We don't know until we -- until we get

6    there and we may very well make the decision not to rely on

7    this defense.

8           But we think that not knowing how this may play out,

9    that a good starting point would be to have a deadline of six

10   weeks before the close of fact discovery.

11          THE COURT:  That sounds awfully close because I take

12   it there are probably loads of documents.  Well, in fact we're

13   going to get in a minute to this categorization of privilege

14   that -- you know, whether you have to list every privileged

15   document individually or whether you can do it by category.

16   It's one of the categories in your report.

17          So when you tell me you want to do it by category, I

18   take it that means there's a lot of privileged documents.

19   Now, Mr. Stadnick, did you want to speak?

20          MR. STADNICK:  Yes, Your Honor.  I think that there

21   may be an awful lot of privileged documents doesn't

22   necessarily bear on the scope of additional discovery that

23   might have to follow on any election --

24          THE COURT:  But you have to give them the documents.

25          MR. STADNICK:  Well, it depends.  I mean, there's

Roda - Argument                              Page 52

1    going to be a litigation over what the scope of the waiver is

2    and there could be many privileged documents that don't fall

3    within the scope of whatever waiver is ultimately -- is

4    ultimately found to exist in connection with the election of

5    the defense and I think that's one of the difficulties in

6    trying to address these issues in the abstract today, is I

7    think they're more appropriately addressed once counsel's had

8    an opportunity to evaluate the case as a whole and decide

9    which defenses to pursue and which not to pursue before they

10   make the onerous decision as to waive privilege.

11        And then we're going to have to decide what the

12   consequential waiver of privilege -- what the scope and the

13   bounds of that are and then we'll take a look to see what

14   documents might fit within those bounds and which witnesses

15   might be impacted.

16        I personally would assume that we're probably talking

17   about a few decision makers who are involved and a handful of

18   attorneys who are involved so I don't share the view that

19   necessarily this is going to require widespread reopening of

20   discovery and a lot of duplicative effort.

21        THE COURT:  Because I take it, Mr. Roda, you wouldn't

22   be deposing the lawyers unless there's advise of counsel

23   defense.

24        MR. RODA:  That's correct, if they've invoked

25   attorney client privilege, which one has to assume that they

Roda - Argument                               Page 53

1    would.

2            THE COURT:  Sure, sure.  So, in other words, it

3    wouldn't be -- I guess what I'm saying is you wouldn't be

4    duplicating the deposition of lawyers, you wouldn't have had

5    their depositions anyway and you'd be taking them on the

6    advice of counsel issue.

7            MR. RODA:  Right.  But we would be duplicating the

8    non-lawyers --

9            THE COURT:  Sure --

10           MR. RODA:  -- whom we had deposed.

11           THE COURT:  Sure.

12           MR. RODA:  And if I might address a couple of points,

13   Your Honor, this case has been pending for a year in this

14   Court.  It strikes me as surprising to hear that -- well, it's

15   been pending for a year, this is not a novel issue.  As I say,

16   GSK is in the Wellbutrin SR case, the principal defendant,

17   that motion in limine is now before the Court and has been for

18   eight months.

19           In other cases, this type of issue has been

20   percolating because it's inherent in the nature of a sham

21   litigation case.  So it -- it's very surprising to hear that

22   there has been no consideration given to this issue by the

23   defendants yet as to what they're going to do.

24           And when they say let's wait and see how this plays

25   out or what the consequences are, I suggest what that means is

Roda - Argument                              Page 54

1    let's wait and see what the plaintiffs get if we invoke

2    privilege, how strong their case is at that point, and we'll

3    weigh then strategically in the chess game, will we invoke the

4    privilege or not.  It's not a matter of let's see how it plays

5    out as to what information we the defendants learn as we go

6    along in this case.

7            They know it.  They could convene a meeting of a

8    handful of people -- Mr. Stadnick just referred to at his

9    defendant or the handful at Biovail and say okay, what went

10   down, what -- who made the decision, what was it based on.

11   There may be lots of documents but we know that is because

12   there are -- these documents are sent to all members of the

13   team.  But when you distill the story, you distill the

14   decision, that's something that won't take them months to do.

15           Six weeks for before the end of discovery would be

16   after class certification has been -- we would have taken so

17   much discovery at that point and risked duplication for so

18   much that -- and it's unnecessary under the facts.  The

19   hypotheticals that they are posing don't really hold true when

20   we stop and think about what we're talking about here.

21           THE COURT:  Okay, all right.  Well, let's do this.

22   Let's leave this for the moment.  It may be that I want to

23   convene another discussion of this issue at some point when

24   after perhaps these decisions are made with respect to these

25   privileged documents -- when I say privileged documents I mean

Royall - Argument                          Page 55

1   the -- you know, the confidential documents -- the Anchen and

2   the IMPAX and the like.

3        But I think six weeks before the end of discovery,

4   especially if I use your schedule which is pretty far in

5   advance, Mr. Royall, I don't see how we do that.  On the other

6   hand, I don't know enough yet.  I mean, Mr. Stadnick has said

7   well, the duplication -- there's only a few decision makers.

8        Maybe what we need to do is flesh this out a little

9   more and then -- you know, the defendants tell me, just -- you

10  can even do it by letter and all, tell me -- that may make

11  sense actually -- tell me when you think you can tell me how

12  much time you need and why, with more specifics than we

13  haven't seen the documents, it won't be that duplicative and

14  we're talking sort of round about here.

15       We don't really have concrete facts.  So during the

16  rest of this conference think about that and, Mr. Royall and

17  Mr. Stadnick, think about whether at the end of this

18  conference you can tell me when you can send me a letter

19  explaining to me how much time you need and why you need it

20  and how much duplication or not you think would result -- you

21  know.

22       And again, you don't have to tell me how many

23  depositions but generally, it would be five, it would be 25 --

24  I don't know.  If it's 25, that's a lot of people.  If it's

25  five, maybe it's not so many.  All right, so let's continue

1    going on for a while here.  I do need to leave at 12:15,

2    although that gives us plenty of time but I don't want to

3    shortchange any issue at the end.

4            Now, these categorical privilege logs, which is

5    Biovail's proposal and the plaintiffs of course understandably

6    would like to have the specific -- the specific documents

7    listed.  Where are we on that?  Have you been able to work

8    something out?  Have you continued to discuss that, what makes

9    sense in terms of this?  Mr. Royall, do you want to speak to

10   that?

11           MR. ROYALL:  Well, if I'm not mistaken, there may

12   have been discussions and I'm not aware, but I think that the

13   report does give you the statements of the discussions.  I

14   don't know if there's been any further progress in reaching

15   any kind of agreement.  We just laid out our positions

16   anticipating that --

17           THE COURT:  Okay.

18           MR. ROYALL:  -- that we would --

19           THE COURT:  No, that's fine.

20           MR. ROYALL:  -- we would speak with you about this.

21           THE COURT:  Sure.

22           MR. ROYALL:  I don't know that -- I don't know that

23   this is an issue that necessarily needs to be resolved today

24   but we did want to preview it for you and our thoughts on

25   this.  Because this is a litigation that does relate to other

1    litigations in which there were, as Ms. Tessar said, four

2    years of litigation in which there were obviously many, many

3    privileged communications that were created, the burden of

4    creating an itemized privilege log here would be something

5    that would be very, very difficult for the parties --

6             THE COURT:  It does sound -- it does sound very

7    burdensome.  Who's going to respond to this?  Are you on

8    discovery, Mr. Sobol?

9             MR. SOBOL:  Yes, Your Honor.

10            THE COURT:  Can we do something that solves the

11   plaintiff's concerns?  I understand the plaintiffs say gee, we

12   need a chance to challenge the privileged nature of a document

13   -- you know, we get the right to say, Judge, they listed it as

14   privileged but we don't think it's privileged -- that's your

15   concern, right?  You want to be able to make those kinds of

16   arguments and you're concerned that if it's a category by

17   category -- you know, you won't be able to, right, Mr. Sobol?

18            MR. SOBOL:  That's correct, Your Honor.

19            THE COURT:  Okay.

20            MR. SOBOL:  So --

21            THE COURT:  Yes, go ahead.

22            MR. SOBOL:  -- So trying to figure out what would be

23   a sensible accommodation between both parties, and also

24   recognizing that frankly none of the plaintiffs have any

25   interest in seeing a 20,000 page privilege log that lists

1    draft after draft after draft of a motion here or there or

2    whatever where -- which would not be relevant to anybody's

3    purposes, we came up with the following potential solution.

4    The first is that we think that there ought to be drawn a

5    pretty sharp line between documents created before the lawsuit

6    or citizen petition is filed and after.

7            And the reason for that is that the pre-suit or pre-

8    citizen petition documents clearly are going to be of a lesser

9    scale in terms of their number and are also going to go

10   directly to the issue as to objective and subjective

11   reasonableness, if you will, of the matter.

12           And so we think that that pre-suit or pre-citizen

13   petition documents for each of these should be -- you know,

14   individually marked and designated on a log.  That's one

15   cutoff.  The second then is for post-suit documents, we're

16   simply interested in -- not in routine day to day documents

17   that are passing between -- you know, the lawyers and the non-

18   lawyers at the two institutions that will be drafts of

19   documents or transmittals of things that are happening in

20   Court.

21           But instead, documents that are discussing whether to

22   maintain or to settle the litigation or to evaluate the

23   litigation at a sort of -- in a summary fashion, provide a

24   overall status report, if you will.  You can imagine -- and I

25   know I'm sort of drafting here on the fly and I don't mean to

Royall - Argument                           Page 59

1    do that too much, Your Honor, but I think we all recognize

2    that during the course of one litigation or four litigations

3    or a citizen petition, there will be much by way of routine

4    correspondence, emails -- what have you.

5         But every once in a while there might be here's your

6    quarterly report, here's where we are at, right, or something

7    else of that nature -- an evaluation, a status report,

8    something that's discussing, maintaining or settling the

9    litigation, something that's directing how to address an

10   SECONDARY filing regarding the status of the case.

11        Identify those by individual designation and then

12   give us the broad categories as the balance.  That should, we

13   think, at least a priori it seems to us, address the bulk of

14   the effort that would be --

15            THE COURT:  Okay.

16            MR. SOBOL:  -- not towards any good effort.

17            THE COURT:  All right.  Let's get Mr. --

18            MR. SOBOL:  Everybody reserving their rights, of

19   course.

20            THE COURT:  No, I understand.  Let me get Mr.

21   Royall's thoughts on that.

22            MR. ROYALL:  Well, could I ask Your Honor --

23            THE COURT:  Sure.

24            MR. ROYALL:  -- did I mishear Mr. Sobol?  Were there

25   four items?  Were there more items to your proposal, Mr.

Royall - Argument                                    Page 60

1    Sobol, or were those --

2         MR. SOBOL:  No, I think that was it.

3         MR. ROYALL:  Okay, I just wanted to make sure I

4    understood.

5         MR. SOBOL:  I might think of another one while I'm

6    sitting here.

7         MR. ROYALL:  Okay.  Your Honor, these are helpful

8    ideas, I think for us to consider.  This is the first that

9    we've heard of them and it may be that it was just this

10   morning when plaintiff's counsel was able to get together and

11   confer that they came up with these ideas so I think that this

12   is a productive -- this opens a productive opportunity for

13   discussion.

14        What I would propose is rather than trying here on

15   the spot to respond to these things that we set up a time soon

16   to confer with plaintiff's counsel to see if we can reach some

17   kind of agreement on this, and if not, to advise Your Honor

18   where we stand.

19        THE COURT:  Sure, sure, and then you can -- yes, and

20   if you can't agree -- you know, send me letters in telling me

21   where you are -- you know, in other words, this is as you say

22   a start, and again, Mr. Sobol isn't aware of what the numbers

23   are.  You know, it may be that this isn't good enough because

24   the numbers are voluminous even before that but think about it

25   because I do think some sort of categorization makes sense.

1          On the other hand, I understand Mr. Sobol's situation

2     that he wants to be able to challenge some of these as not

3     being privileged.  Okay, all right, and so I leave it up to

4     you all.  I mean, if either side believes it's not moving

5     quickly enough, just drop me a note but I don't think that

6     will happen.  So before you leave here, why don't you see if

7     you can come to some agreement as to when to meet to discuss

8     that issue.

9          MR. ROYALL:  Yes, Your Honor.

10          THE COURT:  You can all even stay here if you'd like

11     when I go off the bench.

12          MR. ROYALL:  Okay.  We'll certainly do that -- I'm

13     sure we can find the time to promptly discuss it and --

14          THE COURT:  Yes, because you probably need to go back

15     and talk to the people who really know what you've got here,

16     and I assume --

17          MR. ROYALL:  Yes.

18          THE COURT:  -- Mr. Royall, you don't have it at your

19     fingertips, obviously --

20          MR. ROYALL:  I don't.

21          THE COURT:  -- how many documents are covered by each

22     of those categories.  Okay, very good.  All right, that's fine

23     and we'll do that and then age privilege designations and

24     challenges, you've agreed to what you've set out here.  That's

25     fine with the Court.

Sobol - Argument                                    Page 62

1          Now, the scheduling order -- let me see what else --

2     and what comes after is really pretty much a discussion -- up

3     until page 19 is a discussion of the -- of that schedule.  I

4     try to be realistic when I schedule because I have found that

5     even when I think that I'm realistic, things happen and

6     lawyers are always asking me for extensions.

7          I really prefer to start with something that's

8     realistic so that I can feel comfortable at some point saying

9     I don't -- you know, I hear you, but you've already had

10    however much time -- you know, you told me that this was

11    realistic.  So unless it's obviously a medical emergency or

12    something or if there's a little something that has to occur

13    after the dates, of course we're not talking about that.

14         But I really would like to come to a schedule that

15    you all know is realistic, and I don't know that I want to put

16    in there no extensions will be given but -- I mean, that's

17    sort of -- I would like you to assume that.

18         So having said that, Mr. Roda, Mr. Sobol -- I don't

19    know who I'm -- I mean, my tendency will be to go with -- I

20    don't know specifically on every single date but the defense

21    as opposed to -- it seems that the dates that the plaintiffs

22    have given me -- I mean, no matter how much you think you can

23    do it -- then even the plaintiffs think they can do it then,

24    it seems awfully short to me.

25         I mean, I just -- life as it is, I just don't think

1     they're realistic -- the plaintiff's dates.  So having said

2     that, Mr. Sobol -- I didn't mean to cut you off but I really

3     do think that I'd like to get something realistic here.  We

4     don't even yet have all these underlying documents decided,

5     whether they're going to be produced.  I don't know how

6     difficult it's going to be to get them.

7            So anyhow but, Mr. Sobol, I'll certainly hear from

8     you as to what -- you know, what your thoughts are on this,

9     knowing that I think your dates are just a little too

10    aggressive.

11           MR. SOBOL:  Sure.  Obviously when it comes to

12    schedules the discretion of the Court is almost completely

13    unfettered and how it is that you manage your own docket and

14    how it is that the course the litigation goes is really going

15    to be up to you.  We recognize that.

16           And I'm also going to share with you two observations

17    that you probably know about already anyway, but it's at least

18    been in my modest experience, there's nothing that gets the

19    parties focused other than a trial date, no matter what kind

20    of case it is and with that trial date, the realisticness of

21    that trial date.

22           And the only thing that has to be realistic about the

23    trial date is whether or not the Court's going to insist that

24    the parties go forward by that date.  The other thing that I

25    would suggest is whatever is realistic is only a matter --

Sobol - Argument                          Page 64

1 it's in the eye of the beholder.  In other words, you could

2 set this case for trial January of next year, 2010.  That

3 could be theoretically realistic in the sense that you could

4 do this -- run this case like a bankruptcy case --

5    THE COURT:  I understand, Mr. Sobol --

6    MR. SOBOL:  -- and I'm not suggesting we've done

7 that.

8    THE COURT:  -- believe me.  I was a lawyer --

9    MR. SOBOL:  Right.

10    THE COURT:  -- and I had some Judges who did four

11 months --

12    MR. SOBOL:  Right.

13    THE COURT:  -- anti-trusts, securities --

14    MR. SOBOL:  Exactly.

15    THE COURT:  -- car accident -- whatever it is, it's

16 four months --

17    MR. SOBOL:  Exactly.

18    THE COURT:  -- and I've done it --

19    MR. SOBOL:  Right.

20    THE COURT:  -- and I've been in depositions for 30

21 days straight.

22    MR. SOBOL:  Right.

23    THE COURT:  So I don't do that.

24    MR. SOBOL:  So but --

25    THE COURT:  I mean, I don't do that with a car

Sobol - Argument                              Page 65

1    accident case so I'm sure not going to do that here.

2              MR. SOBOL:  Right.

3              THE COURT:  And you're going -- you would ask me not

4    to and I would -- believe me, I've had them.  Plaintiffs have

5    said we want four months or five months, I've given them eight

6    and they come back and they want nine or ten.

7              MR. SOBOL:  Right.

8              THE COURT:  I mean, it's life as it is and I'm a

9    pushover so I don't -- if I feel that I've given you plenty of

10   time, then I feel that I can say no --

11             MR. SOBOL:  Right.

12             THE COURT:  -- okay?  But I'm just not going to do

13   that.

14             MR. SOBOL:  Sure.

15             THE COURT:  I'm not going to say to lawyers I don't

16   care that this or that terrible thing happened, you're going

17   to trial in January of 2010.

18             MR. SOBOL:  Right.

19             THE COURT:  And I also take time to decide things

20   obviously, but I do -- it's important for me to try at least

21   to get it as right as I can and obviously people can disagree

22   with it so I'm not going to -- I mean, I don't know how much

23   the class cert issue, for example, will be in dispute.  I

24   don't know.

25             I haven't done an anti-trust class action

Sobol - Argument                                    Page 66

1  certification decision in a long, long time.  I don't know if

2  I've done one as a Judge, and certainly not after Hydrogen

3  Peroxide.  So I'm going to want to really spend time on it so

4  to think of a trial in January, 2010 would be ridiculous --

5  you know, it would be silly.

6           MR. SOBOL:  But my point though, where I'm going --

7           THE COURT:  Yes.

8           MR. SOBOL:  -- because I know that that's not where

9  the Court would want to go, I'd also say that I've run into

10  Judges like that too and what we have said basically is it's

11  like a shoe salesman only he only has a shoe of one size and

12  everybody has to fit into that one shoe.  My point here though

13  is this.

14           Whatever date we have set for a trial and that is set

15  forth here, recognizing that the Court is already leaning

16  toward the defendant's side, is that what the plaintiffs would

17  ask is two thing -- first that the Court see that those --

18  whatever dates you're now setting out -- as being truly firm

19  dates which only under extraordinary circumstances ought to be

20  changed.  That's easy --

21           THE COURT:  I thought that's what I -- isn't that

22  what I just said?

23           MR. SOBOL:  Yes, it is.  That's the easy one.

24           THE COURT:  Okay.

25           MR. SOBOL:  But then the second one is a little bit

1    more nuanced and is this.  What happens between now and those

2    dates, it makes sense for the parties and the Court to make

3    sure that we're on top of the dates.  What I would suggest is

4    that we have either a monthly or a bimonthly status conference

5    to know that we are moving forward in a timely way.  I'll give

6    you an example.

7            For good reasons, this status conference was first

8    going to be held I think back in March or April or something

9    like that -- okay?  One person's schedule can't accommodated

10   and then something happens with the June date, now we're here

11   in August.  The reality is we've lost a season -- a full

12   season, accomplished little in the litigation.

13           I would say that's not anything against the

14   plaintiffs or the defendants, it's just the reality of the

15   situation, and the case has not moved forward.  So what I

16   would be asking for is if we could have a monthly or a status

17   conference every other month, right, but that we know as we're

18   moving forward, that these dates have to be met.

19           And therefore, parties will have to produce their

20   documents, they will have to produce their witnesses, they

21   have to move forward because we're basically, as you have

22   said, and I respect that obviously, we're not going to be

23   changing these dates except for very extraordinary

24   circumstances.

25           So it's -- it's keeping the task at mind that we're

Sobol - Argument                                Page 68

1      going to be realistic with this --

2              THE COURT:  Okay, well I don't know if we need to

3      have monthly meetings.  I've done that in MDLs.  I don't know

4      if I need to do that in an anti-trust case, to bring you all

5      in.  I mean, you're -- you know, I've got two sets of lawyers

6      and I've got one set of lawyers in a way here and you'll all

7      be working together.  I don't know if it makes sense.  If both

8      sides want me to do a monthly, I'll do my best to do it, it's

9      just that if I'm in trial -- you know, I'll probably cancel

10     it.

11             But on the date, was there -- I didn't remember

12     getting a dispute about a date.  I know there were movements

13     on dates but I thought whoever needed a movement, the other

14     side agreed.  I mean, if somebody wants to do something and

15     one side disagrees, let me know.

16             MR. SOBOL:  I think there --

17             THE COURT:  You know, maybe I decided something and

18     there was a disagreement but I don't remember.

19             MR. SOBOL:  There was a communication between counsel

20     where I had indicated it's fine to move it so long as we're

21     doing it the next week.

22             THE COURT:  Oh, I see.

23             MR. SOBOL:  And then the next thing we knew, it had

24     been postponed two months and we couldn't unwind it.

25             THE COURT:  Okay.

Sobol - Argument                            Page 69

1           MR. SOBOL:  Now, that's not -- again, I'm not trying

2      to cast -- you know, say anything negative, I just --

3           THE COURT:  No, well you should write me a letter

4      saying can we do it sooner.  I mean, I'd rather have that than

5      have a monthly meeting.

6           MR. SOBOL:  Right.

7           THE COURT:  If there's an issue just because it's --

8      I've been in trial a lot lately and I'm also in Washington a

9      lot working so it might be hard, but if there's an issue, drop

10     me a note and say Judge, can we have it earlier and if I

11     possibly can -- because we can meet at 5:00 on days if I'm in

12     trial --

13          MR. SOBOL:  Right.  Okay.

14          THE COURT:  -- if it's really that urgent --

15          MR. SOBOL:  Right.

16          THE COURT:  -- to do it.  All right --

17          MR. SOBOL:  The other thing --

18          THE COURT:  -- yes?

19          MR. SOBOL:  -- I was just going to say --

20          THE COURT:  Yes.

21          MR. SOBOL:  -- the defendants have summary judgment

22     being finalized in the middle of 2011, okay?

23          THE COURT:  March 11th --

24          MR. SOBOL:  Right.

25          THE COURT:  -- March 18th.

1          MR. SOBOL:  Okay.  That is, in our experience, when

2     people are focused in terms of moving a case forward, an

3     extraordinary amount of time.  I would hope that in an anti-

4     trust case like this which is a relatively defined set of

5     facts, it's an area where basically all of the lawyers have

6     been litigating in this area -- it's almost like a cottage

7     industry.

8          We know all the cases off the top of our heads and

9     all the rest of that, we should be able to be moving this case

10    toward a hearing that happens before the middle of 2011 in

11    order to have summary judgment.  But again, I know that you

12    have discretion and all the rest of that.  We're equally

13    intent on trying to -- whatever dates you set, that we're not

14    going to get moving from them.

15         THE COURT:  Okay, fair enough.  Mr. Royall?

16         MR. ROYALL:  Yes, Your Honor?

17         THE COURT:  Your thoughts?

18         MR. ROYALL:  Well, just a few thoughts.  I had

19    forgotten how much of this is set forth in the report but just

20    so you know the chronology, how we got to the defendant's --

21    yes, the defendant's proposed schedule, we started with a

22    schedule that provided for more time that we thought was

23    reasonable, given we had people study, we have handled

24    ourselves similar cases, in fact, one in which Mr. Sobol was

25    involved where we represented Johnson and Johnson.

Royall - Argument                               Page 71

1          But we looked at the schedules of many other cases,

2     and what we started with was a schedule that we thought was

3     reasonable and defensible, given those other -- what happened

4     in those other cases.  We then compromised in good faith,

5     hoping to reach agreement with the plaintiffs.  Significantly,

6     we reduced the time for fact discovery under our proposal by

7     quite a number of months and compressed the schedule to

8     something that we thought was -- was streamlined but still

9     realistic.

10          And I know it looks like a lot of time to think about

11     summary judgment in March of 2011 but realistically having

12     litigated cases like this, cases not quite as complex as this

13     because they involved only one underlying alleged sham

14     litigation as opposed to four, it takes a lot of time, and

15     we're -- as you've heard today, we're starting not from what

16     the defendants would normally start from in terms of their

17     knowledge of the underlying facts.

18          We still have a lot to learn once we get these

19     confidentiality issues resolved.  And so we think that this is

20     -- this is realistic, it's actually more streamlined than most

21     of the schedules and cases.  If you looked at Wellbutrin SR,

22     for instance, where fact discovery went for over two years,

23     the number I have in front of me is after extensions it was

24     24.25 months.

25          In the Ditropan XL case, which was the Johnson and

1   Johnson case I mentioned -- you know, that Mr. Sobol and

2   others here I'm sure were also involved in, it was almost 19

3   months for fact discovery and if you look at these cases also,

4   you see that there were repeated extensions to the schedule,

5   and that's what we were hoping to avoid.  We're mindful of the

6   statement that we saw on your local rules about not granting

7   extensions except in extreme cases.

8           And so what we came up with was something that we

9   felt that we could in good faith live with.  It was not --

10  this is -- this is two modifications closer to a streamlined

11  schedule and not something that we intended to bargain from

12  further.

13          Just commenting on Mr. Sobol's -- Mr. Sobol agrees

14  the issue of a trial date to get counsels' attention, I will

15  tell you this, Your Honor, I looked at all of this on the

16  plane here and even our own proposed schedule gets my

17  attention.  There's a lot to do in this case.  There's a huge

18  amount of work to be done with experts and further fact

19  discovery.

20          And this -- the deadlines laid out in defendant's

21  schedule very much get my attention and I'm sure in that

22  regard I speak for all defense counsel.  This is going to be a

23  lot of work, even living with this schedule, but we understand

24  that we should be -- fully expect that we will have to do that

25  and that we cannot expect that oh well, we'll just get more

Sobol - Argument                              Page 73

1    time later, as has often happened in many of these other

2    cases, but we're not expecting that to happen here.

3            So that's all I have to say about that.  I'm happy to

4    answer any questions if you have them about -- about the --

5            THE COURT:  Okay.

6            MR. ROYALL:  -- precise time periods.

7            THE COURT:  All right, thank you very much, Mr.

8    Royall.  Let me turn to Mr. Sobol first.  Is there any --

9    putting aside how far out some of the dates are, what about

10   the time between dates?  Are there any objections to that?

11   And that will give me something to work with.

12           MR. SOBOL:  No, I mean, I basically -- it's like an

13   accordion, Your Honor, right?  I mean, our accordion is

14   tighter and theirs is a little bit longer but apart from that

15   -- you know, I think that the dates are what the dates are.

16           THE COURT:  Okay.  Now --

17           MR. SOBOL:  And --

18           THE COURT:  Go ahead.

19           MR. SOBOL:  Well, there are two other issues we

20   should schedule too, the Rule 37 and the declaration of advice

21   of counsel, but we'll deal --

22           THE COURT:  Sure --

23           MR. SOBOL:  -- I assume that you want to deal with

24   that in a moment.

25           THE COURT:  Sure.  Oh, no, we'll -- yes, we're going

1    to go back to that --

2              MR. SOBOL:  Okay, fine.

3              THE COURT:  -- in just a moment, but let's just look

4    at this list for a bit.  So both of you are proposing December

5    14th for the plaintiff's class certification motion and any

6    supporting expert reports, and then, Mr. Royall, you're asking

7    me for three months to -- oh no, excuse me -- yes, for three

8    months to do your opposition, and Mr. Sobol or the plaintiffs

9    are proposing a deadline of January 26th.

10             Talk to me about what you envision happening between

11   now and March.  Why do you think you need that much time to

12   oppose the class cert?

13             MR. ROYALL:  Well, Your Honor, I believe that my

14   experience in dealing with these cases is it's complicated.

15   Until we see their motion, we don't know precisely what we're

16   dealing with.  We'll be working with experts and compiling

17   factual record.  We most likely will need to do third party

18   discovery.

19             That's actually something that in terms of getting my

20   attention, that very much has my attention, that we will need

21   to do third party discovery relating to class issues and

22   that's not always easy, it's very time consuming.  But putting

23   all of that together and an effective opposition and one that

24   we think will hopefully serve as a helpful record for the

25   Court in resolving these class certification issues, it takes

Royall - Argument                              Page 75

1    time.

2           And the three months, we could -- we could pull out

3    and cite for you any number of other schedules in similar

4    cases where at least three months was allowed between the time

5    of the filing of the class motion and the opposition.

6           THE COURT:  I know, and believe me, I get requests

7    all the time.  You know, if you set it -- I've had cases where

8    the parties have agreed -- they've agreed on a schedule and

9    then before I know it, they want another two months to file

10   their motion and then another three months.  Look, it's the

11   reality of what happens.

12          It's not the right way perhaps, but these things sort

13   of always do get extended out so I would like a date that's

14   real.  And let me ask you, have you sort of sat together to

15   say look, this is what discovery we want to do -- you know,

16   between now and class cert, whether you call it class

17   discovery or merits discovery -- have you done that sort of

18   thing with each other?

19          MR. SOBOL:  Yes, we have, Your Honor.

20          THE COURT:  You have -- okay.  So --

21          MR. SOBOL:  And there's -- there's -- I'm sorry.

22          THE COURT:  That's okay.  And so what does it look

23   like? in other words, how many depositions are you expecting

24   to take between now and the class briefing and that sort of

25   thing?

1          MR. SOBOL:  Well, in terms of the numbers of

2     depositions, we haven't discussed the numbers of depositions.

3     We have on the base of experience and sort of having a notion

4     about the level of the number of decision makers that are

5     involved, the kinds of information that we know that the

6     pharmaceutical companies and particularly this -- one of these

7     companies -- GSK -- keeps by way of impact and damages, we

8     have a sense about what that is, which is why -- and having

9     just done it a bunch of times and also having Courts just look

10    at -- you know, Direct Purchaser anti-trust case, which

11    although factually there might be a lot of information,

12    frankly, it's not a novel area at this point, particularly in

13    the pharmaceutical area, it's pretty well worn.

14          So we've sort of done that and we have a -- we have a

15    sense but the parties haven't committed to numbers on either

16    of those things.  It is our view though that this being -- you

17    know, August, and there being the entire fall and then -- you

18    know, December right before we even file our class

19    certification brief, the defendant will be doing all of the

20    things that they need to do between now and even then to

21    prepare its opposition --

22          THE COURT:  Well, will --

23          MR. SOBOL:  -- the notion that it would need another

24    three months to file the opposition is --

25          THE COURT:  Will these -- well, whatever the

1   documents are for the underlying cases that will be dealt with

2   in the Rule 37 motion, they're not needed for class cert, I

3   take it?

4           MR. SOBOL:  By and large, no, they're not.  I mean,

5   the issues that are relevant in class certification first from

6   the plaintiff's point of view are proving -- you know, that

7   the defendants estimated how quickly a generic would get to

8   market, what that would do to price, how prevalent the generic

9   would be sucked up in the market -- that's one thing we deal

10  with, right?

11          And then the other issue is -- you know, how the

12  wholesalers tend to -- you know, be relatively the same,

13  that's an issue that the defendants try to raise.  Those

14  aren't terribly necessary in order to get into the underlying

15  liability issue of a sham or not because frankly, in an anti-

16  trust case, although you have to look at the issue to be sure,

17  it is often the case that the liability issues are the same

18  for all the class members.

19          You don't really have to get into that.  Again, these

20  issues of -- that I've just articulated about -- impact and

21  damages and the similarity among -- amongst wholesalers is

22  something that's been dealt with time and time and time again,

23  that it's almost -- you know, like deja vu for going through

24  the exercise in a case specific manner.

25          THE COURT:  Will these -- will whatever the documents

Sobol - Argument                              Page 78

1     are for the underlying cases that will be dealt with in the

2     Rule 37 motion, they're not needed for class certification?

3           MR. SOBOL:  By and large, no, they're not.  I mean,

4     the issues that are relevant in class certification, first

5     from the plaintiffs' point of view, are proving, you know,

6     that the defendants estimated how quickly a generic would get

7     to market, what that would do to price, how prevalent the

8     generic would be sucked up in the market.  That's one thing

9     that we deal with, right.

10          And then the other issue is, you know, how the

11    wholesalers tend to, you know, be relatively the same.  That's

12    an issue that the defendants try to raise.

13          Those aren't terribly necessary in order to get into

14    the underlying liability issue of a sham or not, because,

15    frankly, in an antitrust case, although you have to look at

16    the issue to be sure, it is often the case that the liability

17    issues are the same for all the class members.  You don't

18    really have to get into that.

19          Again, these issues of -- that I've just articulated

20    about impact and damages and the similarity amongst

21    wholesalers is something that's been dealt with time and time

22    and time again, and that it's almost, you know, like a deja vu

23    for -- going through the exercise in a case specific manner.

24    So --

25          THE COURT:  So in terms of depositions, whose

Colloquy                                    Page 79

1    depositions would you be needing for the class issue --

2              MR. SOBOL:  So --

3              THE COURT:  -- categorically, not specific.

4              MR. SOBOL:  -- yeah, sure.  From the defendants we

5    take a deposition of some of the marketing people who did

6    estimates regarding what the impact might be of generic

7    erosion.  That's typically a large part of what we do.  If

8    they have any information regarding what the impact was post,

9    you know, launch of a generic, we'll also look at that issue

10   as well.

11             There's usually a handful of people from each

12   organization that had that kind of relevant information,

13   right, and those documents for us to do, okay.  The -- yeah,

14   this is an area where there might be people in each

15   organization that have what's called lifecycle management or

16   evergreening, i.e., that this isn't an effort, sometimes

17   lawful, sometimes not unlawful, to genuinely try to prolong

18   the life of a branded drug, so we might take a few of those

19   people's deposition.  But it's a handful, relatively speaking,

20   from each organization that we would take.

21             We would anticipate that the defendants would want to

22   take a handful of depositions, obviously, the depositions of

23   the class plaintiffs, you know, right.  But there may be some

24   other people who are in the class, particularly, they try to

25   get upstream -- excuse me -- downstream discovery of -- of

Colloquy                              Page 80

1      financial information, again, pretty routine stuff.

2              And then we take depositions of experts, so each side

3      has at least one expert, maybe we have a couple of experts

4      each that will testify about how the class is relatively

5      uniform, there was relatively uniform impact, you can model

6      them on a classified basis.  Each side takes their experts'

7      deposition and that's roughly what we anticipate.

8              THE COURT:  Okay.  Mr. Royall.

9              MR. ROYALL:  Well, Your Honor, just -- just to be

10     clear, we -- I don't believe that we have spoken with -- it's

11     helpful to hear this today, but I don't think we have spoken

12     with plaintiffs' counsel about specific discovery, what both

13     sides plan to do on -- on class cert.

14             THE COURT:  But let me ask you, Mr. Sobol, why not?

15     Why didn't you -- I mean, have they not met -- agreed to meet

16     with you?  I mean, you -- you want to get this moving.  Why

17     haven't you all met before now?

18             MR. SOBOL:  Well, I mean --

19             THE COURT:  If you tell me Mr. Royall refused, I'm

20     going to --

21             MR. SOBOL:  -- I'm not trying to disagree with Mr.

22     Royall, but I think in the context of the schedule --

23             THE COURT:  Yes.

24             MR. SOBOL:  -- we certainly -- everybody has

25     discussed what it is that they expect the level of work to be

Colloquy                                    Page 81

1    and how much time to do it.  And maybe another reason why we

2    haven't discussed it is, you know, it's -- it's self-evident.

3    Again, I don't mean to, you know, beat the dead horse, but

4    this has been done in so many other cases with this

5    defendant --

6             THE COURT:  No, but, I mean, are there -- you could

7    be coming up with schedules, for example, or telling them the

8    people you want to -- so you're not -- you haven't started yet

9    saying, these are the marketing-type people we want.  And then

10   Mr. Royall is saying --

11            MR. SOBOL:  No.

12            THE COURT:  -- well, here they are, I mean, these are

13   the ones by specific name, and let's take them in September,

14   October, their depositions.

15            MR. SOBOL:  Right.  Well, what we tried to do, at the

16   beginning of the -- months ago, I mean, four or five months

17   ago, for us to be able to figure out who those people are --

18            THE COURT:  Right.

19            MR. SOBOL:  -- we gave the defendants a list of what

20   we thought their initial production should be, which is what

21   we've done in many other cases, so we could learn who those

22   people were, right, and so we gave them a list.  And we said,

23   give us -- as has happened in many other cases -- just give us

24   the documents from the underlying litigation, right, give us

25   the names of the -- of the people who made the decisions here.

Colloquy                                    Page 82

1   I'm trying to go to where our initial disclosures were.

2          THE COURT:  No, I did read that listing of the

3   documents, yeah.

4          MR. SOBOL:  But -- and that would have enabled us

5   then to be able to say, all right, here are the kinds of

6   people we're going to need to depose, right, and I'll give you

7   an example here.  Hold on a moment, please.

8          (Pause in proceedings.)

9          MR. SOBOL:  You know, there's -- basically, we had

10  outlined the basic documents from the underlying litigation,

11  right, that would enable us to do that, and we were told that

12  they would not be willing to give that information to us on an

13  initial basis, right.

14         THE COURT:  Okay.  Well, that's -- that stuff doesn't

15  go to class cert, so --

16         MR. SOBOL:  Well --

17         THE COURT:  -- but in any event, it really is -- it's

18  neither here nor there --

19         MR. SOBOL:  Right.

20         THE COURT:  -- at this point in time.  I'm just

21  wondering why, if there is an interest in really moving along,

22  you know, schedule something and sit down and -- and if Mr.

23  Royall and his colleagues won't meet with you, just let me

24  know.  But, Mr. Royall, what are your thoughts?  So ahead,

25  sir.

Colloquy                              Page 83

1          MR. ROYALL:  Well, Your Honor, we'll be happy --

2    happy to meet with him and talk about this.

3          The one comment, just hearing Mr. Sobol speak, the

4    one thing I thought I would -- I would say, is that plaintiffs

5    in the interest of the class action litigation, not

6    surprisingly, and I don't say this disparagingly, but they

7    view this as all very simple and straightforward, and so it

8    doesn't surprise me to hear Mr. Sobol say, oh, this has been

9    done many times, it's very simple and straightforward.

10         Defendants on the other hand often, with good reason

11   I believe, are working hard to explain to the Court, no, this

12   is not -- not nearly as simple as the plaintiffs would like

13   you to believe in terms of common impact and what have you.

14   And so we have to work really hard to produce evidence to draw

15   out the realities of the way that distributions occurs and the

16   disparate impact that may be -- go to class certification

17   issues and how there are different agreements with different

18   drug wholesalers about how the drugs are sold, and serious

19   questions as to whether drug wholesalers are even injured at

20   all by any alleged delay in generic -- in the timing of

21   generic entry.

22         And those things can be very complicated, and it's

23   usually the defendants that are bearing the burden of trying

24   to dredge up all of that evidence to present to the Court so

25   that we can have what we consider balanced consideration of

Colloquy                                    Page 84

1   class cert, you will undoubtedly hear from us.  No, things are

2   not as simple as the plaintiffs are saying.  So that's where

3   we're coming from, why we feel that we need -- we need more

4   time.

5         And that evidence -- some of that evidence that we

6   would want to compile would be evidence from the plaintiffs,

7   but much of it would be from third parties, and we've -- we

8   haven't met and conferred on this, and so -- and I know that

9   both sides have objections to each other's discovery, but I

10  did note yesterday in reading it, that there's some pretty

11  broad blanket objections from plaintiffs to our discovery on

12  some of these very sorts of complexities that I'm alluding to,

13  and so we're going to have to work -- work through those

14  objections.

15        But we don't see it as -- as simple -- even under

16  this schedule, we're going to have to work hard to make sure

17  that we get all the evidence and build the record that we need

18  so that -- so that our experts can evaluate and -- and along

19  with our briefs, present all of the issues we think the Court

20  should consider.

21        THE COURT:  Okay.  Well, what is your thinking on our

22  getting together monthly or every couple of months?

23        MR. ROYALL:  We had -- obviously, Your Honor,

24  whatever you prefer, we have no objection.  We want to make

25  sure that this -- this is moving forward and that we are --

Colloquy                              Page 85

1      we're on track to meet the deadlines in your schedule.  I

2      don't know that a monthly meeting where we all actually

3      convene in person is necessary.

4              It may be that we can -- we can confer -- we can

5      confer certainly on a monthly basis without the Court and then

6      call to the Court's attention any -- any issues that we think

7      are significant enough to bother you with if there are any.

8      That's the approach that I think may be best, just so we don't

9      unnecessarily use the Court's time or spend unnecessary time

10     traveling to Philadelphia --

11              THE COURT:  Well, that's what I --

12              MR. ROYALL:  -- and being in the courtroom when we

13     could be out doing the work that needs to be done.

14              THE COURT:  Yes.  I'm concerned about everybody --

15     yes.  Where are you coming from, Mr. Royall?  Remind me.

16              MR. ROYALL:  I live in Dallas.

17              THE COURT:  You're from Dallas.  And how about you,

18     Ms. Tessar?

19              MS. TESSAR:  I'm from Denver.

20              THE COURT:  You're from Denver.  And how about over

21     here?

22              MR. DESMARAIS:  New York.

23              THE COURT:  New York.

24              MR. PARK:  Washington, DC, Your Honor.

25              THE COURT:  Washington, DC.  I know where Mr.

Colloquy                                    Page 86

1    Zemaitis is from.  He's from here.  And who -- from the other

2    side, I'm so sorry, Mr. Rogers -- no, not --

3            MR. ROGERS:  Yes, I'm from here.

4            THE COURT:  -- yes, Mr. Rogers, you're from

5    Philadelphia.  Okay.

6            MR. SOBOL:  If I may, Your Honor --

7            THE COURT:  Okay.  And then over here, you're all

8    from all over as well.  I know where Mr. Roda is from,

9    Lancaster, but how about everybody else?  Are you from --

10           MR. SOBOL:  Home of the Boston Red Socks, Your Honor.

11           THE COURT:  Okay.

12           MR. SOBOL:  Just so it's clear, in terms of a monthly

13   status, that can also be by phone.

14           THE COURT:  Yes.  We do a lot by phone.

15           MR. SOBOL:  In my experience, what's been helpful is

16   that -- if the parties three days beforehand --

17           THE COURT:  Yes.

18           MR. SOBOL:  -- send to the Court a status report and

19   then we just do it by phone, then what you're doing is, you're

20   keeping the Court and the parties on their toes in terms of

21   what the issues are, you're checking in.  It doesn't have to

22   be in person, but it's also a way that all the parties and the

23   Court know that we're doing what we can to meet your

24   deadlines.

25           THE COURT:  Yes.  Maybe -- maybe I'll certainly ask

1   for monthly reports, and we can try to schedule a -- a

2   telephone call.  It's just that there's even so many lawyers

3   that -- believe me, I do this all the time -- and we're

4   constantly getting requests, Judge, it's scheduled for 4:00,

5   can you move to 3:00?  Can you move it to 5:00?  Somebody has

6   to do this, and I'm -- I try to be -- so none of this is as

7   easy as it sounds like -- as it should be, but we try -- we do

8   the best we can.

9        You try to accommodate everybody, because, you know,

10  life happens in addition to law, right?  So people have other

11  issues that they have to deal with sometimes.  And the lawyers

12  have them and they call me, and I'm usually prepared to move

13  things.  But let's see what we can do.

14       All right, everybody.  Well, I will go back and mull

15  over everything you've told me, and I'll get a schedule out as

16  soon as -- I mean, obviously, today or tomorrow so that you'll

17  all know what you're working under at least certainly in the

18  near future.

19       Now, let me see.  Are there any other issues that

20  people wanted to bring, the coordination with the indirect

21  purchaser case, obviously, we don't want any duplication of --

22  please, everybody, no duplication.  I can't stand the thought

23  of the cost of anything like that.  Mr. Royall?

24       MR. ROYALL:  That was actually the issue I was going

25  to raise, is I've -- I've been assuming, but I'm not sure -- I

Colloquy                                    Page 88

1    want to make sure that this is the Court's understanding, but

2    that the schedule that the Court establishes here would apply

3    to both the direct and indirect purchaser cases, so we keep

4    the two matters are on the same track.

5              THE COURT:  What do you think, Mr. Zohl -- Zylstra?

6              MR. ZYLSTRA:  Zylstra.

7              THE COURT:  Zylstra.

8              MR. ZYLSTRA:  Good morning, Your Honor.  Yes, that's

9    -- that's why we're here --

10             THE COURT:  Okay.

11             MR. ZYLSTRA:  -- to make ourselves available to the

12   Court.  We intend to coordinate with our direct purchaser

13   brother and with the defendants.

14             THE COURT:  Great.  Thank you very much.

15             Mr. Stadnick, did you want to be heard on the timing,

16   because I didn't hear from you?

17             MR. STADNICK:  No, Your Honor.  I don't have anything

18   to say to amplify Biovail's positions.  We are, you know, in

19   agreement with them.  We submitted the schedule jointly, and I

20   --

21             THE COURT:  Okay.

22             MR. STADNICK:  -- I would agree that given the

23   complexities of the case, it is a realistic schedule.

24             THE COURT:  Okay.  And let's go then to the Rule 37.

25   When did you all want to file that, Mr. Kohn -- or, Mr. Sobol,

Colloquy                              Page 89

1    what are you all thinking?

2              MR. SOBOL:  8-10, Your Honor.

3              THE COURT:  Excuse me?

4              MR. SOBOL:  August 10th.

5              THE COURT:  8-10?  Sure.  And then the normal time

6    will kick in and when I get that, I'll do the order that I

7    suggested.  Okay.  And then, you know, the normal time will

8    kick in and I'll tell our friends at those other companies

9    that -- if they want to come in, they need to come in.

10             Okay.  And then the declaration from counsel -- I

11   don't know, declaration, but the letter from defense counsel

12   telling me when they think -- or when do you think you can

13   give me a letter on the advice of counsel?

14             MR. ROYALL:  We'll -- that is something -- if we

15   could, Your Honor, I have not had a chance since you raised it

16   earlier, to confer with --

17             THE COURT:  Sure.

18             MR. ROYALL:  -- with Mr. Stadnick.  If we could get

19   back to the Court on that issue?

20             THE COURT:  Of course.  Sure.  Why don't you get back

21   to me by the end of the week?

22             MR. ROYALL:  That's fine.

23             THE COURT:  Okay?  As to when you're going to be able

24   to, but let's make it as soon as -- as soon as you can,

25   obviously.  You know, I mean, talk to each other, of course.

Colloquy                                    Page 90

1    I'm not going to force you to tell me right this minute, but

2    try to get more realistic than six weeks before the end of

3    fact discovery.  Yes?

4              MR. SOBOL:  And then --

5              THE COURT:  I'm sorry, Mr. Stadnick?

6              MR. STADNICK:  I was just going to ask if I could

7    have some clarification exactly what the Court would

8    anticipate in the letter, just so we could meet with --

9              THE COURT:  No.  I just want to know a date by which

10   you can give me your position with more specificity.  In other

11   words, if you tell me now, Judge, we need two weeks, a week,

12   whatever, to say -- to give you a letter that says, Judge, on

13   the advice of counsel, we propose telling the plaintiffs

14   whether or not we will invoke it on this particular date, and

15   let me tell you why we need that much time.  Because there

16   are, you know, whatever -- you know, these number of -- oh, I

17   know -- forgive me, I'm already off the topic, but let me get

18   back to it again.

19             We need that much time to make the decision, because

20   there's all these documents we have to review.  We really want

21   to do this very methodically.  And by the way, Judge, it will

22   not cause duplication because we have now done our research

23   and there's only three decision-makers who might have to be

24   re-deposed, because the lawyers won't be testifying anyway.

25   There's only this many documents.  Give me some basis for

Colloquy                                    Page 91

1    thinking that you really need whatever it is you need, if it's

2    six weeks before the end of fact discovery.

3           So that's all I'm asking you, to tell me now when

4    you're going to get me the letter that tells me the more

5    important thing.

6           MR. ROYALL:  Okay.

7           MR. STADNICK:  Thank you, Your Honor.

8           MR. ROYALL:  And I just want to be clear about that.

9    So the letter -- the letter that we'll send you by the end of

10   the week will just be a short letter that says that we --

11          THE COURT:  We'll give you the other letter.  That's

12   why I thought maybe --

13          MR. ROYALL:  -- we'll give you the other letter by a

14   certain time.

15          THE COURT:  Right.  That's why I was thinking maybe

16   if you could talk to Mr. Stadnick now --

17          MR. ROYALL:  Okay.

18          THE COURT:  -- for example, you might be able to tell

19   me today when you think you can do that, and then that will

20   give Mr. Sobol comfort so he doesn't have to, you know, say

21   wait a minute, you don't need whatever amount of time.

22          MR. ROYALL:  Could we -- I would say in the next

23   three weeks or so we could -- we could confer and get you a

24   letter?

25          THE COURT:  Two weeks.

Colloquy                                Page 92

1          MR. ROYALL:  Two weeks?

2          THE COURT:  Two weeks from today, how about that?

3          MR. ROYALL:  Is two weeks okay?

4          THE COURT:  Two weeks from today, and then, of

5    course, you can respond to it, yes.

6          MR. SOBOL:  In three business days?

7          THE COURT:  Sure, sure.

8          MR. ROYALL:  And so that obviates the need for the

9    letter at the end of this week?

10         THE COURT:  You don't need any other letter.

11         MR. ROYALL:  Okay.

12         THE COURT:  I know I talk fast.  I'm sorry.  I'm from

13   Philadelphia.  I'm sorry.  I have to slow down.  All right.

14         MR. ROYALL:  All right.  That's fine.  Thank you,

15   Your Honor.

16         THE COURT:  Mr. Sobol, did you have another issue?

17         MR. SOBOL:  No, that was -- we were just making -- I

18   just wanted to make sure we had an opportunity to respond.

19   That's all.

20         THE COURT:  Oh, of course, absolutely, absolutely.

21   In fact, I probably give everybody too much time.  We always

22   -- everybody responds, I hear from everybody.

23         All right, counsel, anything further we can do this

24   morning -- or this afternoon?

25         MR. SOBOL:  I don't believe so.

Page 93

1        THE COURT:  All right.  Thank you very much for

2   coming in, and I'll get the schedule out.  Thanks so much.  We

3   are adjourned.

4            MR. SOBOL:  Thank you, Your Honor.

5            MR. ROYALL:  Thank you, Your Honor.

6            (Proceedings concluded at 12:04 p.m.)

7                            * * *

8

9

10

11             C E R T I F I C A T I O N

12

13

14   We, Diane Gallagher and Lois Vitarelli, Court approved

15   transcribers, certify that the foregoing is a correct

16   transcript from the official electronic sound recording of the

17   proceedings in the above-entitled matter.

18

19

20   _____          _____

21   DIANE GALLAGHER                   DATE

22

23   _____

24   LOIS VITARELLI

25   DIANA DOMAN TRANSCRIBING