## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: WELLBUTRIN XL ANTITRUST LITIGATION | ) ) ) ) | Case No. 2:08-cv-2431 |
| THIS DOCUMENT RELATES TO: | ) ) ) | **Hon. Mary A. McLaughlin** |
| Direct Purchaser Actions | ) ) ) | |

## DIRECT PURCHASER PLAINTIFFS'
## FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Direct Purchaser Plaintiffs ("Plaintiffs") request that Defendants SmithKline Beecham Corporation and GlaxoSmithKline plc ("GSK"), and Biovail Corp., Biovail Laboratories, Inc., and Biovail Laboratories International SRL ("Biovail") (collectively, "Defendants") produce for inspection and copying the following documents and things within 30 days.

## INSTRUCTIONS

1.      Plaintiffs seek production of the documents set forth in the numbered requests below in Defendants' possession, custody, and control, control being construed as including in the possession of Defendants' attorneys, accountants, or other agents, and including all entities comprising the definitions of "GSK" and "Biovail" below.

2.      The headings set forth within the numbered requests below are for convenience only and shall not be deemed to control or affect the meaning or construction of any request.

3.      Unless otherwise stated, these requests cover the period January 1, 1997 to the present.

## DEFINITIONS

1.      "GSK" means SmithKline Beecham Corporation and GlaxoSmithKline plc, including any present or former parent companies, subsidiary companies, related companies, divisions, operating units, affiliates, agents, attorneys, officers, directors, employees, servants, independent contractors and/or consultants, predecessors or successors-in-interest, or any other person or entity acting, authorized to act, or purporting to act on behalf of GSK.

2.      "Biovail" means Biovail Corp., Biovail Laboratories, Inc., and Biovail Laboratories International SRL, including any present or former parent companies, subsidiary companies, related companies, divisions, operating units, affiliates, agents, attorneys, officers, directors, employees, servants, independent contractors and/or consultants, predecessors or successors-in-interest, or any other person or entity acting, authorized to act, or purporting to act on behalf of Biovail.

3.      "Pharma Pass" means Pharma Pass LLC including any present or former parent companies, subsidiary companies, related companies, divisions, operating units, affiliates, agents, attorneys, officers, directors, employees, servants, independent contractors and/or consultants, predecessors or successors-in-interest, or any other person or entity acting, authorized to act, or purporting to act on behalf of Pharma Pass.

4.      "'341 Patent" refers to U.S. Patent No. 6,096,341 entitled "Delayed Release Tablet of Bupropion Hydrochloride," issued on August 1, 2000.

5.      "'327 Patent" refers to U.S. Patent No. 6,143,327 entitled "Delayed Release Coated Tablet of Bupropion Hydrochloride," issued on November 7, 2000.

6.      "Underlying actions" means:

a.      *Biovail Laboratories, Inc. and SmithKline Beecham Corp. v. Abrika, LLLP,*  No. 04-cv-61704 (S.D. Fla.) ("Abrika Action").

b.   *Biovail Laboratories, Inc. and SmithKline Beecham Corp. v. Anchen Pharmaceuticals, Inc.,* No. 04-cv-1468 (C.D. Ca.) ("Anchen Action").

c.   *Biovail Laboratories, Inc. v. Impax Laboratories, Inc.,* No. 05-cv-01085 (E.D. Pa.) ("Impax Action").

d.   *Biovail Laboratories XLL v. Watson Laboratories, Inc (SmithKline Beecham Corp.,* Counterclaim Defendant), No. 05-cv-7799 (S.D.N.Y.) ("Watson Action").

e.   *Biovail Corp et al. v. U.S. Food and Drug Administration,* No. 14-0687 (D.D.C.).

7.   "Citizen Petition" means the petition filed by Keller & Heckman LLP pursuant to 21 C.F.R. § 10.30 and section 505(j) of the federal Food Drug Cosmetic Act on behalf of Biovail Corp. dated December 20, 2005.

8.   "Wellbutrin IR" means a form of bupropion sold by GSK and approved by the FDA on December 30, 1985.

9.   "Wellbutrin SR" means a form of bupropion sold by GSK and approved by the FDA on October 4, 1996.

10.   "Generic Wellbutrin SR" means a prescription drug approved by the FDA as an AB-rated bioequivalent substitute for Wellbutrin SR.

11.   "Generic Wellbutrin XL" means a prescription drug approved by the FDA as an AB-rated bioequivalent substitute for Wellbutrin XL.

12.   "Abrika" means Abrika, LLLP, Abrika Pharmaceuticals, Inc., and Abrika Pharmaceuticals, LLLP, including any present or former parent companies, subsidiary companies, related companies, divisions, operating units, affiliates, agents, officers, directors, employees, servants, predecessors or successors-in-interest, or any other person or entity acting, authorized to act, or purporting to act on behalf of Abrika.

13.     "Anchen" means Anchen Pharmaceuticals, Inc., including any present or former parent companies, subsidiary companies, related companies, divisions, operating units, affiliates, agents, officers, directors, employees, servants, predecessors or successors-in-interest, or any other person or entity acting, authorized to act, or purporting to act on behalf of Abrika.

14.     "Impax" means Impax Laboratories, Inc., including any present or former parent companies, subsidiary companies, related companies, divisions, operating units, affiliates, agents, officers, directors, employees, servants, predecessors or successors-in-interest, or any other person or entity acting, authorized to act, or purporting to act on behalf of Impax.

15.     "Watson" means Watson Laboratories, Inc., including any present or former parent companies, subsidiary companies, related companies, divisions, operating units, affiliates, agents, officers, directors, employees, servants, predecessors or successors-in-interest, or any other person or entity acting, authorized to act, or purporting to act on behalf of Watson.

16.     "Person" or "entity" means natural person, individual, firm, corporation, partnership, proprietorship, joint venture, unincorporated association, government agency, and any other organization or entity of any kind.

17.     "Concerning" means constituting, containing, reflecting, discussing, or referring to, in whole or in part.

18.     The words "and" and "or" shall be construed either in the disjunctive or the conjunctive, so as to bring within the scope of the discovery request the broadest range of documents.

19.     The words "any," "each," and "all" shall be construed as to be synonymous so as to bring within the scope of the discovery requests the broadest range of documents.

## DOCUMENT REQUESTS

**A.    DOCUMENTS CONCERNING THE PATENTS**

1.    All documents concerning the '341 Patent and '327 Patent, including documents concerning development, prosecution, approval, issuance, assignment, and licensing of the patents.

2.    All documents concerning the validity or enforceability of the '341 Patent and '327 Patent, including documents concerning any investigation done by or for GSK or Biovail concerning the validity or enforceability of the '341 Patent and '327 Patent.

3.    All documents prepared, provided to, or reviewed by Pharma Pass LLC or Pawan Seth concerning the development, prosecution, approval, issuance, and licensing of the '341 Patent and '327 Patent, or Wellbutrin XL.

4.    All documents concerning the acquisition of Pharma Pass by Biovail.

5.    All documents concerning the assignment of the '341 Patent and '327 Patent to Biovail.

6.    All documents concerning communications between GSK or Biovail, on the one hand, and Abrika, Anchen, Impax, or Watson, on the other, concerning the '341 Patent and '327 Patent.

**B.    DOCUMENTS FROM THE UNDERLYING ACTIONS**

7.    All motions, responses, pleadings, memoranda, briefs, affidavits/declarations, correspondence and all other documents generated or used, by any party or nonparty, in the underlying actions and filed in court, with exhibits and appendices, except for documents that are publicly available in unredacted form.

8.     All transcripts of deposition testimony, witness statements, affidavits/declarations, expert reports, disclosures, and discovery requests and responses, with exhibits, generated or used by any party or nonparty in the underlying actions not filed in court.

9.     All documents considered by expert witnesses for any party in the underlying actions.

10.     All logs, lists, indices, or other documents or databases identifying the documents produced or obtained through discovery by all parties or nonparties in the underlying actions.

11.      All logs, lists, indices, or other documents or databases identifying the documents that were withheld from production in whole or in part by any party or nonparty in any of the underlying actions for any reason, including but not limited to any privilege claim assertions, relevance objections, or confidentiality.

## C.     DOCUMENTS CONCERNING THE UNDERLYING ACTIONS

12.     All documents concerning any proposed or actual prosecution of claims of infringement of the '341 Patent and '327 Patent.

13.     All documents concerning the decisions by GSK or Biovail to initiate the underlying actions.

14.     All documents concerning GSK's or Biovail's evaluation of the basis, merits, likelihood of success, or purpose of the underlying actions.

15.     All documents concerning the scope or effect of any proposed or actual outcome of the underlying actions, including but not limited to settlement or judgment following trial.

16.     All documents concerning communications to which Biovail or GSK was a party concerning any claim in or defenses to the underlying actions.

17.     All documents concerning settlements of the underlying actions.

**D.**     **DOCUMENTS CONCERNING THE CITIZEN PETITION**

18.     All documents submitted to the FDA by GSK or Biovail or any person acting on their behalf, or any other person, concerning the Citizen Petition.

19.     All documents concerning the decision to file the Citizen Petition.

20.     All documents concerning GSK's or Biovail's evaluation of the basis, merits, likelihood of success or purpose of the Citizen Petition.

21.     All documents concerning the scope and effect of any proposed or actual outcome of the Citizen Petition process.

22.     All documents concerning communications to which GSK or Biovail was a party concerning the Citizen Petition or claims set forth in the Citizen Petition.

23.     All documents concerning the bioequivalence of generic Wellbutrin XL to Wellbutrin XL.

24.     Documents sufficient to identify all citizen petitions filed by or on behalf of GSK or Biovail from January 1, 1997 to December 19, 2005.

25.     All documents concerning the FDA Amendments Act of 2007, 21 U.S.C. § 355(q), enacted September 27, 2007, concerning FDA review of citizen petitions, including without limitations communications between GSK and Biovail, on the one hand, and Congress or the FDA, on the other.

**E.**     **DOCUMENTS CONCERNING THE DEVELOPMENT AND FDA APPROVAL OF WELLBUTRIN XL**

26.     All documents concerning the development, formulation, scale up, validation, FDA approval, manufacture, promotion, and sale of any once per day bupropion formulation, including Wellbutrin XL.

27.     All documents concerning the use of acid stabilizers in bupropion formulations.

28.     All documents concerning the bioequivalence of Wellbutrin XL to Wellbutrin IR or Wellbutrin SR.

29.     All documents concerning the NDAs filed by GSK seeking approval to market Wellbutrin XL.

30.     All documents concerning communications between GSK and the FDA concerning Wellbutrin XL.

31.     All documents concerning the listing of the '341 Patent and '327 Patent under the Wellbutrin XL NDA in the FDA Orange Book publication entitled, "Approved Drug Products with Therapeutic Equivalence Evaluations," otherwise known as the Orange Book.

**F.      DOCUMENTS CONCERNING ENTRY OF GENERIC WELLBUTRIN SR**

32.     All documents concerning potential or actual market entry of generic Wellbutrin SR, including without limitation the timing of such entry.

33.     All documents concerning life cycle management for Wellbutrin SR, including patent term extensions, regulatory exclusivities, patent enforcement and litigation strategies, Orange Book filings, changes to formulation, dosage, and means of administration, label changes, licensing opportunities, and follow-on product strategies for Wellbutrin SR, including the development of extended release bupropion formulations.

34.     All documents concerning strategies, including pricing strategies, marketing strategies, branded-generic strategies, follow-on product strategies, patent strategies, and litigation strategies, considered by GSK to prepare for, respond to, or adapt to the projected or actual effects of the marketing and sale of one or more versions of generic Wellbutrin SR.

35.     All documents concerning forecasts or projections of the effects on branded Wellbutrin SR unit sales, dollar sales, prices, and profits from the marketing and sale of one or more versions of generic Wellbutrin SR.

36.     All documents concerning marketing plans, surveys or studies concerning the effect of market entry of generic Wellbutrin SR on sales of branded Wellbutrin SR.

**G.     DOCUMENTS CONCERNING ENTRY OF GENERIC WELLBUTRIN XL**

37.     All documents concerning potential or actual market entry of generic Wellbutrin XL.

38.     All documents concerning lifecycle management for Wellbutrin XL, including patent term extensions, regulatory exclusivities, patent enforcement and litigation strategies, Orange Book filings, changes to formulation, dosage, and means of administration, label changes, licensing opportunities, and follow-on product strategies for Wellbutrin XL.

39.     All documents concerning strategies, including pricing strategies, marketing strategies, branded-generic strategies, follow-on product strategies, patent strategies, and litigation strategies, considered by GSK or Biovail to prepare for, respond to, or adapt to the projected or actual effects of the marketing and sale of one or more versions of generic Wellbutrin XL.

40.     All documents concerning forecasts or projections of the effects on branded Wellbutrin XL unit sales, dollar sales, prices, and profits from the marketing and sale of one or more versions of generic Wellbutrin XL.

41.     All documents concerning marketing plans, surveys or studies concerning the effect of market entry of generic Wellbutrin XL on sales of branded Wellbutrin XL.

42.     All documents concerning pricing of Wellbutrin XL, including documents concerning the factors considered by GSK and Biovail in setting or changing  list prices or adjustments to prices, such as rebates and discounts, of branded Wellbutrin XL.

43.     All documents concerning the development, formulation, scale up, validation, FDA approval, manufacture, promotion, and sale of generic Wellbutrin XL by Abrika, Anchen, Impax, and Watson.

44.     All documents concerning bioequivalence studies performed by or on behalf of Abrika, Anchen, Impax, or Watson concerning generic Wellbutrin XL.

45.     All documents concerning FDA bioequivalence guidelines, including documents concerning FDA publications *Providing Clinical Evidence of Effectiveness of Human Drugs and Biologic Products* (1988); *Bioavailability and Bioequivalence Studies for Orally Administered Drug Products - General Considerations* (2000); and *Bioavailability and Bioequivalence Studies for Orally Administered Drug Products - General Considerations* (March 2003).

46.     All documents concerning any physical, regulatory, legal, technical, manufacturing  or other issues regarding the readiness, willingness, or ability of Abrika, Anchen, Impax, or Watson to come to market with AB-rated generic Wellbutrin XL.

## H.     DOCUMENTS CONCERNING DEALINGS WITH MANUFACTURERS OF GENERIC WELLBUTRIN XL

47.     All documents concerning communications between GSK and Biovail, on the one hand, and Abrika, Anchen, Impax, or Watson, on the other, concerning branded or generic Wellbutrin XL.

48.     All documents concerning all agreements between GSK or Biovail, on one hand, and Abrika, Anchen, Impax, or Watson, on the other, concerning the manufacture, promotion, and sale of generic Wellbutrin XL, including licensing agreements, royalty agreements, and agreements concerning timing of market entry.

**I.   DOCUMENTS CONCERNING THE ANTITRUST PRODUCT MARKET OF WELLBUTRIN XL**

49.   All documents concerning the relative features, benefits, or comparisons between or among Wellbutrin XL and all other drugs used to treat the same conditions as Wellbutrin XL.

50.   All documents concerning factors that affect sales or market share as between or among Wellbutrin XL and all other drugs used to treat the same conditions as Wellbutrin XL.

51.   All documents concerning the functional or economic substitutability of Wellbutrin XL with any other drugs used to treat the same conditions as Wellbutrin.

52.   All documents concerning the cross-elasticity of demand with respect to price between or among Wellbutrin XL and all other drugs used to treat the same conditions as Wellbutrin XL.

53.   All documents concerning actual, potential, desired, or forecasted switching or substitution between or among Wellbutrin XL and all other drugs used to treat the same conditions as Wellbutrin XL.

54.   All documents concerning the actual or projected size, composition, dollar sales, and unit sales of the United States market in which Wellbutrin XL is sold.

55.   All documents concerning actual or forecasted competition between Wellbutrin XL and any other drugs.

**J.   DOCUMENTS CONCERNING PROMOTION OF WELLBUTRIN XL**

56.   All documents concerning the sales and marketing tactics and strategies for Wellbutrin XL, including (a) sales training materials and presentations; (b) sales and marketing meeting materials, presentations, and summaries; and (c) tactical plans, strategic plans, and budget proposals.

57.   All documents concerning the promotion and advertising of Wellbutrin XL, including (a) communications and advertising directed to physicians; (b) detailing pieces; (c) press releases; (d) communications with pharmacy benefit managers, insurers, health plans, and third-party payors; and (e) direct to consumer advertising.

58.   All documents concerning medical education concerning Wellbutrin XL, including (a) presentations to institutes, symposium, conferences and seminars; (b) publications in professional journals; and (c) surveys and any other types of studies.

59.   All documents concerning pricing of Wellbutrin XL, including documents concerning the factors considered by GSK and Biovail in setting or changing list prices, or determining adjustments to prices, such as rebates and discounts.

**K.   DOCUMENTS CONCERNING SALES OF WELLBUTRIN XL AND ALL OTHER DRUGS USED TO TREAT THE SAME CONDITIONS AS WELLBUTRIN XL**

60.   Documents sufficient to identify every direct purchaser of Wellbutrin XL.

61.   All documents concerning contracts for the sale of Wellbutrin XL including (a) contracts with entities that purchased Wellbutrin XL directly from defendants, (b) contracts that provide that the purchaser will take delivery of Wellbutrin XL from an entity other than GSK or Biovail (such as a wholesaler); and (c) contracts concerning the payment of chargebacks.

62.   Electronic data in a tab-, comma-, or semicolon-delimited ASCII flat text file or similar electronic format from 2005 to the present sufficient to identify sales of Wellbutrin XL to direct purchasers of Wellbutrin XL in transaction-by-transaction format, as follows:

    a.   All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) number of units sold, (iv) returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) product description, (xii) product form, (xiii) product strength, (xiv)

package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to customer and the ship-to customer), and (xix) the customer's parent company (if the data identify a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like).

b.    All  data relating to chargebacks, rebates, discounts, and other consideration given or accrued, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom GSK or Biovail paid, or on whose behalf GSK or Biovail accrued, the chargeback, rebate, discount and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which GSK or Biovail paid or accrued the chargeback, rebate, discount or other consideration; (iv) the sales, or group of sales, upon which the rebate, discount or other consideration is based, including: (aa) the number of units of the particular product sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated.

c.    All administrative fee transactions including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales relating to the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code; and

d.    Any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, and all other transaction types not reflected in the above (a through c), whether created or maintained daily, monthly, quarterly, or at some other periodicity.

e.    The complete documentation for all items above (a through d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g. field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate product list, including NDC, SKU, UPC, product description, and package size; (bb) a separate table that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact

information, address, and class of trade (e.g., SIC code); (ccc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (i) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold and (ii) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (iii) all datasets and calculations used (i) to determine accrued rebates and/or chargebacks and/or (iv) to periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (v) return and/or exchange policies; and (vi) payment terms.

63.    Data generated by IMS and Verispan in whatever format it was received from IMS or Verispan from 2005 to the present for Wellbutrin XL, Wellbutrin XL generics, and all other drugs used to treat the same conditions as Wellbutrin XL, as follows:

  a.    *IMS National Prescription Audit* data, including TRx, NRx, extended units, retail sales dollars and retail sales price. Preferably, the data should be broken out by manufacturer, product, form, strength, NDC and channel.

  b.    *IMS National Sales Perspective* data, including total units, extended units, total sales dollars and price. Preferably, the data should be broken out by manufacturer, product, form, strength, NDC and channel.

  c.    *Verispan Vector One National (VONA)* data, including TRx, NRx, extended units, retail sales dollars and retail sales price.  Preferably, the data should be broken out by manufacturer, product, form, strength, NDC and channel.

64.    Documents sufficient to identify all IMS, Verispan, MediSpan, Scott-Levin, PriceChek, ImpactRx, First DataBank, or other pharmaceutical industry data products purchased by or available to GSK or Biovail concerning  Wellbutrin XL, Wellbutrin XL generics, all other drugs used to treat the same conditions as Wellbutrin XL.

65.    All documents related to any other price adjustment given to any direct purchaser not related to specific sales of Wellbutrin XL.

## L.    DOCUMENTS CONCERNING REVENUES AND PROFITS FROM THE SALE OF WELLBUTRIN XL

66.    Documents sufficient to show GSK's and Biovail's projected and actual revenues, royalties, expenses, and profits, from sale of Wellbutrin XL, monthly and annually, showing the

following: (a) gross revenue; (b) net revenue; (c) cost of goods sold; (d) manufacturing cost; (e) sales and distribution cost; (f) marketing, advertising, promotional, and sales expenses; (g) depreciable and capital improvements; (h) research and development expenditures; (i) licensing fees and royalties paid and received; (j) short-run average variable costs; (k) long-run average variable costs; (l) fixed costs; (m) materials cost; (n) labor cost; (o) marginal cost; (p) rebates and discounts; (q) gross profit; (r) net profit; (s) unit volume sold; and (t) unit volume sold net of returns.

67.     All documents concerning the relationship between prices and costs of Wellbutrin XL.

68.     Documents sufficient to identify the list price, average wholesale price, direct price, and wholesale acquisition cost for Wellbutrin XL for each month.

## M.     DOCUMENTS CONCERNING AGREEMENTS BETWEEN GSK AND BIOVAIL

69.     All documents concerning agreements between GSK and Biovail concerning Wellbutrin XL, including without limitation agreements concerning the following:

  a. Development of Wellbutrin XL, including allocation of costs.

  b. Regulatory approval of Wellbutrin XL.

  c. Licensing of Wellbutrin XL or the '341 Patent and '327 Patent.

  d. Royalties paid or to be paid on the sale of Wellbutrin XL.

  e. Manufacture of Wellbutrin XL, including manufacturing facility approval.

  f. Marketing, promotion, advertising, pricing, and sale of Wellbutrin XL.

  g. Litigation of patent infringement claims concerning the '341 Patent and '327 Patent, or litigation of any other matter concerning Wellbutrin XL.

  h. Indemnification, joint prosecution, or judgment sharing between GSK and Biovail concerning this action, the underlying actions, or any other legal action.

**N.**     **OTHER**

70.     Documents sufficient to show the organization of GSK's and Biovail's employees related to the development, manufacture, marketing, sale and distribution of Wellbutrin XL.

71.     Documents sufficient to show GSK's and Biovail's document destruction, retention and archiving policies and practices and any changes in such policies.

72.     Documents sufficient to identify GSK's and Biovail's policy or practice concerning back-up of data for each year.

73.     All documents concerning any communications between or among GSK and Biovail and any other person or entity concerning this action.

74.     All documents concerning agreements between GSK or Biovail, on the one hand, and any plaintiff, on the other, concerning the purchase and sale of Wellbutrin XL or any other matter.

Respectfully yours,

| | |
|---|---|
| Joseph F. Roda | **/s/ Thomas M. Sobol** |
| Dianne M. Nast (DMN 1791) | Thomas M. Sobol |
| Jennifer S. Snyder | David S. Nalven |
| **RODANAST, P.C.** | Debra Gaw Josephson |
| 801 Estelle Drive | **HAGENS BERMAN SOBOL** |
| Lancaster, PA 17601 | **SHAPIRO LLP** |
| Telephone: (717) 892-3000 | One Main Street |
| Fax: (717) 892-1200 | Cambridge, MA  02142 |
| | Telephone: (617) 482-3700 |
| | Fax: (617) 482-3003 |
| | |
| David F. Sorensen | Linda P. Nussbaum |
| Eric L. Cramer | John D. Radice |
| Peter Kohn | **KAPLAN FOX & KILSHEIMER LLP** |
| Daniel Simons | 850 Third Avenue |
| Sarah Schalman-Bergen | 14th Floor |
| **BERGER & MONTAGUE, P.C.** | New York, NY 10022 |
| 1622 Locust Street | Telephone: (212) 687-1980 |
| Philadelphia, PA 19103 | Fax: (212) 687-7714 |
| Telephone: (215) 875-3000 | |
| Fax: (215) 875-4604 | |

*Counsel for Direct Purchaser Plaintiffs*

Dated: June 16, 2009

## CERTIFICATE OF SERVICE

I hereby certify that I am one of plaintiffs' attorneys and that on this date, I caused copies of the papers annexed hereto to be served on all counsel of record in this proceeding via first class mail and email.

**/s/ Thomas M. Sobol**