IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: WELLBUTRIN XL            :            CIVIL ACTION
ANTITRUST LITIGATION            :
                                :
                                :            NO. 08-2431 (Direct)

MEMORANDUM

McLaughlin, J.                                        August 11, 2011

        The plaintiff Professional Drug Company ("PDC") is a
direct purchaser of Wellbutrin XL, a once-a-day antidepressant,
who is suing the producers of Wellbutrin XL (Biovail Corp.,
Biovail Laboratories, Biovail Laboratories International
(together, "Biovail")) and its distributors (SmithKline Beecham
Corp. and GlaxoSmithKline PLC (together, "GSK")) for illegally
conspiring to prevent generic versions of Wellbutrin XL from
entering the American market through the use of sham patent
litigation.  The plaintiff has moved to certify a class of 35
direct purchasers of Wellbutrin XL under federal antitrust law.

        The defendants contend that the plaintiff has failed to
meet several requirements for class certification under Federal
Rule of Civil Procedure 23.  The defendants' primary argument
against certification is that common issues do not predominate
over individual issues for antitrust impact and damages.  The
defendants argue that class members may have economically
benefitted from the alleged exclusionary conduct, and individual
evidence will be required to demonstrate which, if any, class

members suffered actual harm.  The defendants also argue that
individual proof will be required for several class members who
did not purchase generics or purchased generics indirectly from
other wholesalers.

The Court concludes that the plaintiff has demonstrated
that common issues will predominate and that the Rule 23
requirements for class certification have been met.  The Court,
however, will exclude from the class definition direct purchasers
of Wellbutrin XL that did not purchase generic extended-release
buproprion hydrochloride after it became available.  The Court
will therefore grant in part and deny in part the plaintiff's
motion.

I.   Background and Procedural History

PDC seeks to represent a class of 35 plaintiffs (the
"direct purchaser plaintiffs") that purchased Wellbutrin XL
directly from the defendants during the period of November 14,
2005 through August 31, 2009.  PDC has stated a claim for
(1) conspiracy to monopolize under § 2 of the Sherman Act against
GSK and Biovail, (2) monopolization under § 2 of the Sherman Act
against GSK, and (3) agreement in restraint of trade under § 1 of
the Sherman Act against GSK and Biovail.  See In re Wellbutrin XL
Antitrust Litig., No. 08-2431, 2009 WL 678631, at *9 (E.D. Pa.
Mar. 13, 2009) (dismissing substantive monopolization claim

against Biovail, but otherwise allowing claims to proceed).  The
plaintiff's proposed class is:

> All persons or entities in the United States
> and its territories who purchased Wellbutrin
> XL directly from any of the Defendants at any
> time during the period of November 14, 2005
> through August 31, 2009 (the "Class Period").
> Excluded from the class are Defendants and
> their officers, directors, management,
> employees, parents, subsidiaries, and
> affiliates, and federal government entities.

(Docket No. 306 at 1.)

The plaintiff's complaint alleges that the defendants
conducted a four-part scheme to delay the entry of generic
equivalents of Wellbutrin XL into the market, primarily by
misusing patent litigation.  Specifically, the plaintiff alleges
that the defendants (1) filed three sham patent litigations, (2)
filed a sham listing with the FDA's Approved Drug Products with
Therapeutic Equivalence Evaluation (the "Orange Book") (3) filed
a baseless FDA citizen petition and suit against the FDA, and
(4) formed agreements with potential generic competitors.  PDC
contends that the effect of these activities was to delay the
market entry of cheaper, generic alternatives to Wellbutrin XL.

On July 10, 2080, Meijer, Inc., Meijer Distribution,
Inc. (collectively "Meijer), Rochester Drug Co-Operatrive
("RDC"), and American Sales Company, Inc. filed a consolidated
class action complaint.  On September 4, 2008, American Sales
Company, Inc. voluntarily dismissed its claims pursuant to Rule

41(a)(1)(A)(i).  On September 10, 2008, Biovail and GSK each
filed motions to dismiss.  The Court held a hearing on the
motions on February 26, 2009.  In a Memorandum and Order dated
March 16, 2009, the Court granted Biovail's motion to dismiss as
to one count that alleged that Biovail engaged in substantive
monopolization under section 2 of the Sherman Act, and the Court
denied the motions for all other counts.  See Wellbutrin XL, No.
08-2431, 2009 WL 678631, at *9 (E.D. Pa. Mar. 13, 2009).

        The direct purchaser plaintiffs filed a motion for
class certification on December 14, 2009.  The parties then
engaged in extensive discovery.  For a partial overview of the
parties' discovery disputes, see In re Wellbutrin XL Antitrust
Litig., 268 F.R.D. 539, 541-43 (E.D. Pa. 2010).  On March 17,
2010, the Court granted Meijer's oral motion for voluntary
dismissal under Rule 41(a).  On May 14, 2010, RDC moved for
voluntary dismissal and the direct purchaser plaintiffs moved to
substitute Professional Drug Company, Inc. ("PDC") as class
representative.  On July 21, 2010, the Court granted RDC's motion
for voluntary dismissal provided that it comply with its pending
discovery obligations and the Court substituted PDC as class
representative.  In re Wellbutrin XL Antitrust Litig., 268 F.R.D.
at 547.  Because the three original direct purchaser plaintiffs
have voluntarily dismissed their claims, PDC is now the sole
remaining named plaintiff seeking to represent direct purchasers

4

of Wellbutrin XL.

The Court held a day-long evidentiary hearing on the plaintiff's motion for class certification on April 5, 2011.  PDC presented the expert testimony of Dr. Jeffery Leitzinger and the defendants presented the expert testimony of Dr. Andrew Joskow.[1] On July 11, 2011, the defendants' submitted a supplemental memorandum of law in opposition to the plaintiff's motion for class certification.  On July 19, 2011, the plaintiff submitted a rebuttal memorandum.

II.  Analysis

To certify a class under Federal Rule of Civil Procedure Rule 23, a court must find that the action satisfies all four requirements of Rule 23(a) — numerosity, commonality, typicality, and adequacy of representation — and at least one provision of Rule 23(b).  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997).  PDC seeks certification under Rule 23(b)(3).  Rule 23(b)(3) requires the court to find that

---

[1]     Both experts are highly qualified.  Dr. Leitzinger has a Ph.D. in economics from the University of California, Los Angeles.  He is the president and founder of Econ One Research, Inc. and has offered expert opinions regarding class certification in similar cases that address alleged exclusion of generic competition in the pharmaceutical market.  See, e.g., Am. Sales Co. v. SmithKline Beecham Corp., 274 F.R.D. 127 (E.D. Pa. 2010).  Dr. Andrew Joskow has a Ph.D. in economics from Yale University.  He was the chief economist for the Antitrust Division of the Department of Justice.  He is now Senior Vice President at National Economic Research Associates, Inc.

questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

A proper analysis under Rule 23 requires "rigorous" consideration of all the evidence and arguments offered by the parties.  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008).  A court must "consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class." Id. at 320.  Factual determinations necessary for Rule 23 findings must be made by a preponderance of the evidence.  Id. The court must resolve factual or legal disputes relevant to class certification, even if they overlap with the merits.  Id. at 307.  Furthermore, "[w]eighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands."  Id. at 323. A determination that an expert's opinion is persuasive on a Rule 23 requirement does not preclude a different view at the merits stage of the case.  Id. at 324.

The defendants contend that the plaintiff has failed to satisfy the numerosity, predominance, and superiority requirements.  The defendants argue that: (1) the proposed class is insufficiently numerous such that joinder is impracticable,

(2) common issues do not predominate over individual issues for antitrust impact and damages, and (3) the superiority requirement has not been met.  The Court will address each of the Rule 23(a) and (b) requirements in turn.

      A.    <u>Rule 23(a)</u>

          1.   <u>Numerosity</u>

Rule 23(a)(1) requires a finding that the class is so numerous that joinder of all class members is impracticable. Although there is no precise number for establishing numerosity, classes that exceed forty or more class members generally satisfy this prerequisite.  See <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir. 2001) ("No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.").

In <u>Stewart</u>, the Court of Appeals for the Third Circuit cited favorably to the Rule 23 numerosity discussion in <u>Moore's Federal Practice</u>.  See <u>Stewart</u>, 275 F.3d at 227 (citing 5 James Wm. Moore, et al., <u>Moore's Federal Practice</u> § 23.22[3][a]). <u>Moore</u> explains that classes with between 21 and 40 members are considered mid-sized classes.  These mid-sized classes may or may not meet the numerosity requirement depending on the circumstances of each particular case.  See 5 James Wm. Moore, et

al., Moore's Federal Practice § 23.22[3][a].

In addition to the number of class members, other factors that are relevant to determining the impracticability of joining all members include (1) judicial economy, (2) geographic dispersion, (3) financial resources of class members, (4) the claimants' ability to institute individual suits, and (5) requests for injunctive relief that could affect future class members.  Id.

The Court must determine whether a class of 33 geographically dispersed, direct purchasers is so numerous that joinder of all class members is impracticable.[2]  The defendants argue that joinder is practicable in this case because the direct purchasers of Wellbutrin XL are large, sophisticated entities with sufficient financial resources to pursue their own claims and that each member could seek significant damages, if the claims are proven on the merits.  Although the defendants are correct about the nature of the class members, judicial economy and geographic dispersion of the parties more heavily favor the

---

[2]     PDC seeks to certify a class of 35 members of the putative class.  The proposed class members include 34 pharmaceutical wholesalers as well as the Ohio Department of Mental Health.  As the Court discusses below, two of these proposed class members, Allied Med Wholesale Drug, Co. and Goodwin Drug Co., did not purchase any generic extended-release bupropion hydrochloride after it became available.  The Court concludes that it is appropriate to limit the class definition to direct purchasers who purchased extended-release bupropion hydrochloride after it became available.

use of a class action.

The proposed class includes more than 30 entities that
are located across the country.  Putative class members are
located in California, Illinois, Louisiana, Michigan,
Mississippi, Missouri, New York, North Carolina, North Dakota,
Ohio, Pennsylvania, Puerto Rico, South Carolina, Vermont, and
West Virginia.  The class members' geographic dispersion would
cause substantial difficulty for the parties to conduct discovery
efficiently and to coordinate the litigation.  Furthermore, this
complex case has involved numerous discovery disputes and
repeated joint requests for extensions of the case schedule.  The
Court finds that such delays and other complications would be
greatly increased if all direct purchasers were joined in this
suit.  Judicial economy and geographic dispersion therefore weigh
in favor of the numerosity requirement.  Because of the
complexity and sheer volume of discovery in this case and because
the 33 direct purchasers are located across the country, the
Court finds that the numerosity requirement is satisfied.

This result is consistent with other courts that have
addressed the numerosity requirement for direct purchaser
antitrust class actions that allege unlawful delay of generic
competition.  See Am. Sales Co. v. SmithKline Beecham Corp., No.
08-3149, 2010 WL 4644426, at *4 (E.D. Pa. Nov. 12, 2010) (class
certification uncontested) (33 class members sufficient); In re

K-Dur Antitrust Litig., No. 1419, 2008 WL 2699390, at *3 (D.N.J.
Apr. 14, 2008) (45 class members sufficient); Meijer, Inc. v.
Warner Chilcott Holdings Co. III, Ltd., 246 F.R.D. 293, 306
(D.D.C. 2007) (29 class members sufficient).

      2.   Commonality

      Rule 23(a)(2) requires that there must be questions of
law or fact common to the class.  To satisfy the commonality
requirement, the class's claims must depend upon a common
contention.  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541,
2550-51 (2011).  The common contention must be capable of class-
wide resolution.  Id. at 2551.  A contention is capable of class-
wide resolution if determination of its truth or falsity will
resolve an issue that is central to the validity the claims "in
one stroke."  Id.  A single common question is sufficient.  Id.
at 2556-57.

      The Court finds that the commonality requirement is met
here.  PDC alleges that the defendants engaged in a scheme to
delay the entry of less expensive generic versions of Wellbutrin
XL into the market.  The plaintiff contends that this scheme
caused 300 mg extended-release bupropion hydrochloride to enter
the market in December, 2006 instead of in November, 2005 and
that the scheme prevented entry of 150 mg extended-release
bupropion hydrochloride until May, 2008.  Each class member's

claims depend on whether or not the defendants unlawfully engaged in anticompetitive behavior to limit the entry of generic competitors in violation of federal antitrust law.

     3.  <u>Typicality</u>

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class.  The typicality requirement ensures that the class representatives' interests are aligned with those of the absent class members, so that the representatives work to benefit the class as a whole.  <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 311 (3d Cir. 1998).  "The concepts of commonality and typicality are broadly defined and tend to merge."  <u>Baby Neal v. Casey</u>, 43 F.3d 48, 56 (3d Cir. 1994) (citing 7A Charles A. Wright, et al., <u>Federal Practice and Procedure</u> § 1764).

If the representative's claims and those of the absent class members arise from the same course of conduct and are based on the same legal theories, the class satisfies typicality, regardless of factual differences underlying the individual claims.  <u>Baby Neal v. Casey</u>, 43 F.3d at 57-58.  The Court finds that the typicality requirement is met because the claims of PDC arise from the same course of conduct and are based on the same legal theories as those of the absent class members.

11

4.   <u>Adequacy of Representation</u>

Rule 23(a)(4) requires that the proposed class representative will fairly and adequately protect the interests of the class.  The United States Court of Appeals for the Third Circuit has held that adequacy of representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.  <u>New Directions Treatment Servs. v. City of Reading</u>, 490 F.3d 293, 313 (3d Cir. 2007).

The Court is satisfied that this requirement is met here.  The plaintiff's counsel are well-qualified to represent the proposed class in this case.  They have extensive experience in similar class actions involving delayed generic competition.  <u>See, e.g.</u>, <u>In re K-Dur Antitrust Litig.</u>, No. 01-1652, 2008 U.S. Dist. LEXIS 118396 (D.N.J. Apr. 14, 2008).  The plaintiff's counsel also have vigorously and capably prosecuted this action.

The Court also finds that PDC does not have interests that are antagonistic to those of the class.  The absence-of-conflict requirement "seeks to uncover conflicts of interest between named parties and the class they seek to represent."  <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 532 (3d Cir. 2004) (internal quotation marks omitted).  This requirement is not defeated merely "because of a potential conflict of interest

that may not become actual." <u>Kohen v. Pac. Inv. Mgmt. Co. LLC</u>, 571 F.3d 672, 680 (7th Cir. 2009).  In this case, the plaintiff seeks overcharge damages for purchases made during the class period.  If the plaintiff's claims are proven on the merits, each of the class members would likewise be entitled to seek overcharge damages.  The named plaintiff has the same incentive as any other class member to recover damages from any illegal overcharges for conduct that has already taken place.

B.    <u>Rule 23(b)</u>

Once the requirements of Rule 23(a) are satisfied, a plaintiff must also satisfy one of the three criteria in Rule 23(b).  The plaintiff seeks to have this class certified under Rule 23(b)(3).  Rule 23(b)(3) requires the court to find (1) that questions of law or fact common to class members predominate over any questions affecting only individual members and (2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  These are often referred to as the predominance and superiority requirements.

1.    <u>Predominance</u>

To establish predominance, the plaintiff must show by a preponderance of the evidence that the elements of their claim can be proven by evidence common to all in their class.  <u>See In</u>

13

re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311-12 (3d Cir. 2008). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." Id. at 311 (quoting Newton, 259 F.3d at 172). The elements of the plaintiff's antitrust claims are (1) a violation of the antitrust laws, (2) individual injury or antitrust impact, and (3) measurable damages. Id. at 311. The Court will discuss each element in turn.

a.   Violation of Antitrust Law

The plaintiff has stated a claim for three violations of federal antitrust law: (1) conspiracy to monopolize under § 2 of the Sherman Act against GSK and Biovail, (2) monopolization under § 2 of the Sherman Act against GSK only, and (3) agreement in restraint of trade under § 1 of the Sherman Act against GSK and Biovail. See Wellbutrin XL, No. 08-2431, 2009 WL 678631, at *9 (E.D. Pa. Mar. 13, 2009) (granting Biovail's motion to dismiss for substantive monopolization, and otherwise denying the defendants' motions to dismiss).[3]

---

[3]   The elements of a charge of conspiracy to monopolize under section 2 of the Sherman Act are (1) an agreement between two or more economic entities; (2) a specific intent to monopolize the relevant market; (3) the commission of an overt act in furtherance of the alleged conspiracy; and (4) that there was a dangerous probability of success. Id. at *4.

The elements of a section 2 monopolization claim are (1) the possession of monopoly power and (2) the willful

Proof of antitrust violations in this case involve predominantly common issues.  If each class member pursued its claims individually, the class member would have to prove the same antitrust violations using the same documents, witnesses, and other evidence.  Furthermore, the issues of relevant market, monopoly power, and exclusionary conduct can be proven using common, class-wide evidence because such issues focus on the defendants' conduct rather than individual class members.  See In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 528 (3d Cir. 2004) (noting that liability for anticompetitive conduct focuses on the defendants' actions, not the conduct of individual class members).

   b. Antitrust Impact

Antitrust impact, also known as individual injury or antitrust injury, is the second element of each of the plaintiff's causes of action.  Antitrust impact requires proof

---

acquisition and maintenance of that power as distinguished from growth or development or consequences of a superior product, business acumen, or historical accident.  Crossroads Corp. v. Orange & Utilities, Inc., 159 F.3d 129, 141 (3d Cir. 1998).

The elements of restraint of trade in violation of section 1 of the Sherman act are (1) the defendant was a party to a "contract, combination ... or conspiracy" and (2) the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade.  Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 218 (3d Cir. 2008) (internal quotation omitted).

that the plaintiff has suffered an injury that was caused by the defendants' antitrust violation.[4]  "[T]o prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation."  <u>Hydrogen Peroxide</u>, 552 F.3d at 311.  The Court of Appeals has observed that antitrust impact often is critically important for the purpose of evaluating the predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof.  <u>Id.</u>

At the class certification stage, the plaintiff's burden is not to prove the element of antitrust impact.  The plaintiff must instead demonstrate that the element of antitrust impact is "capable of proof at trial through evidence that is common to the class rather than individual to its members."  <u>Id.</u> at 311-12.  The district court must conduct a "rigorous" assessment of the available evidence and the method or methods by

---

[4]    The Court notes the difference between antitrust impact and the calculation of damages.  "In antitrust and securities fraud class actions, '[p]roof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury).'"  <u>Hydrogen Peroxide</u>, 552 F.3d at 311 (quoting <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 188 (3d Cir. 2001)).  The Supreme Court has explained that plaintiffs under § 4 of the Clayton Act must prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."  <u>Cargill, Inc. v. Monfort of Colo., Inc.</u>, 479 U.S. 104, 109 (1986) (quoting <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489, (1977)).

which the plaintiff proposes to use the evidence to prove impact at trial.  Id. at 312.

The plaintiff's theory of antitrust impact is that the direct purchaser class members paid an illegal overcharge when they purchased Wellbutrin XL because the defendants excluded cheaper generics from the market.  The defendants dispute this theory of overcharge because the price of Wellbutrin XL did not decrease after generic entry.  The defendants conclude that because the price of Wellbutrin XL did not go down, the class members did not pay an overcharge.

If there has been no illegal overcharge, the defendants argue that individualized proof will be required to know which direct purchasers, if any, actually suffered economic injury to satisfy the antitrust impact requirement.  The defendants also argue that class members do not satisfy the statutory injury requirement of Section 4 of the Clayton Act because they may have economically benefitted from delayed generic entry.  The defendants contend that the payment of an overcharge by itself is insufficient to establish statutory injury.

The Court first discusses the parties' divergent theories of illegal overcharge.  The Court then considers the statutory injury requirement of Section 4 of the Clayton Act.  Finally, the Court examines the evidence presented to assess whether the plaintiff has demonstrated that antitrust impact is

capable of proof through common evidence.

                    (1)   Plaintiff's and Defendants' Overcharge
                          Theories

        If a direct purchaser pays an illegal overcharge for a
product, it may recover for the full amount of the overcharge.
See Hanover Shoe, Inc. v. United Machinery Corp., 392 U.S. 481,
489 (1968).  As a general matter, "[t]he overcharge usually
reflects the difference between the price actually charged and
the price that would have prevailed in the absence of the alleged
anticompetitive conduct (i.e., the 'but-for' price under the
'counterfactual')."  ABA Section of Antitrust Law, Proving
Antitrust Damages: Legal and Economic Issues 197 (2d ed. 2010).
See also In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d
677, 689 (2d Cir. 2009) (finding that direct purchasers of
desmopressin acetate tablets had stated a claim and noting that
"overcharges are the difference between the defendants'
supra-competitive price and the competitive price.").

        The plaintiff's theory of antitrust impact is that the
class members suffered an illegal overcharge by purchasing
branded Wellbutrin XL during the class period when the class
could have instead purchased cheaper, generic bioequivalent
drugs, but for the defendants' alleged anticompetitive conduct.
The defendants argue that the price differential between branded
and generic Wellbutrin XL is irrelevant for antitrust impact

                                18

because the products are not fungible in the marketplace.
Instead, the defendants urge the Court only to consider whether
the price charged for Wellbutrin XL was higher than it would have
been in the "but for world."  In support of this argument, Dr.
Joskow, presented evidence that the price of Wellbutrin XL did
not decrease after generic entry.  Defs.' Opp'n Ex. 1 ("Joskow
Decl.") ¶¶ 42-55; Defs.' Sur-Reply Ex. A ("Joskow Reb. Decl.") ¶¶
1-7.

        The issue presented by this dispute is the appropriate
reference point for the but-for "competitive price."  The Court
must decide whether an illegal overcharge for Wellbutrin XL is
based on a comparison between the pre- and post-generic entry
price differences for the branded drug itself or whether an
overcharge should take into account the difference in prices
between the foreclosed generic and the branded drug.  The
starting point for any such decision is the landmark Supreme
Court case, Hanover Shoe, Inc. v. United Machinery Corp., 392
U.S. 481 (1968).  In Hanover Shoe, a shoe machinery manufacturer,
United, refused to sell its machinery to its customers, including
Hanover Shoe.  Instead, United would lease the machinery to
customers.  The District Court determined that if United had sold
its machines, the cost to Hanover would have been less than the
rental paid for leasing the same machines.  This overcharge,
trebled, was the amount of damages awarded to Hanover.

On appeal before the Supreme Court, United argued that Hanover had not suffered an antitrust injury because it had passed on the illegal overcharge to the end shoe purchasers. The Supreme Court rejected this theory and held that a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured by the full amount of the overcharge, even if the excess cost was passed on to the end purchasers. Hanover Shoe, 392 U.S. at 494.

The Hanover Shoe decision rested on two major policy concerns. First, the Court was concerned with the additional complication that would be required by a pass-on defense. See id at 492-93. Second, the Court was concerned with the effectiveness of enforcement of the antitrust laws through private actions. The Court explained that end customers might "have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws . . . would retain the fruits of their illegality because no one was available who would bring suit against them." Id. at 494. "As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows." Id. at 489.

The defendants argue that the overcharge in Hanover Shoe is distinguishable from the plaintiff's theory of overcharge in this case. In support of this argument, the defendants rely

on an indirect purchaser case from the Third Circuit.  See Howard
Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 424 F.3d 363 (3d
Cir. 2005).  In Howard Hess, the plaintiffs were dental
laboratories who were indirect purchasers of artificial teeth,
which are used to make dentures.  The plaintiffs alleged that the
defendant manufacturer foreclosed other competitors' access to
intermediary dealers, which are the primary distributors to
dental labs and set the dealers' resale prices.  The indirect
purchaser plaintiffs argued, among other things, that they had
standing to recover lost profits damages caused by their lost
opportunities to purchase and resell the defendant's competitors'
products.  The Court held that they did not.  Id. at 376.  The
Court concluded that Illinois Brick's prohibition on indirect
purchaser actions could not be circumvented on a theory of lost
profits caused by lost opportunities to purchase and resell the
competitors' products.  Id.

        Howard Hess, the defendants argue, "confirmed that the
concept of an overcharge applies where the product itself has an
illegally high price."  (Defs.' Sur-reply at 7.)  The defendants
are correct that the price of the goods actually purchased must
be illegally high.  In Howard Hess, the Court observed that:

            When antitrust violators cause prices to
            increase through monopolization, a
            price-fixing conspiracy, or exclusionary
            conduct, the harm they cause members of the
            distribution chain comes in two forms: (1)
            overcharges paid for goods actually

> purchased; and (2) lost profits resulting
> from the lost opportunity to buy and resell a
> greater volume of goods.

Howard Hess, 424 F.3d at 373 (emphasis added) (footnote omitted).

The defendants' reliance on Howard Hess, however, conflates two important issues: (1) whether a plaintiff suffered antitrust impact at all (i.e., by actually purchasing a product with an illegally high price) and (2) the proper reference point for the overcharge.  Although the product actually purchased must have an illegally high price, this does not resolve the question as to the proper "but for" competitive market price.

The United States Court of Appeals for the Third Circuit has recognized that an overcharge may be measured with respect to the prices of lower cost competitors.  In In re Lower Lake Erie, the Court of Appeals upheld overcharge damages that were based on the difference between the defendants' services and the lower prices the plaintiffs would have paid for more efficient, competing services that were excluded from the market.  See In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1169 (3d Cir. 1993) (measuring overcharges as the difference between the amount paid to transport ore and the lower prices that would have been paid for a more efficient, lower cost system).

The services in Lower Lake Erie were not identical, but rather were substitutes for each other.  The defendants in Lower

22

<u>Lake Erie</u> excluded the adoption of self-unloading transport that did not require the use of a hulett, which is a type of manually operated crane.  <u>Lower Lake Erie</u>, 998 F.2d at 1153.  The difference in cost between use of the two systems was the measure of the overcharge.  <u>Id.</u> at 1169.  <u>See also</u> <u>In re Cardizem CD Antitrust Litig.</u>, 200 F.R.D. 297, 311 (E.D. Mich. 2001) ("Antitrust law requires only that the two products at issue be close substitutes for each other.").

The defendants argue that branded and generic Wellbutrin XL are not fungible and that any difference in price between branded and generic Wellbutrin XL is caused in part by factors such as consumer perceptions that the branded drug is safer or more effective.  The defendants presented anecdotal reports regarding the quality of Teva Pharmaceuticals' 300 mg version of extended-release bupropion hydrochloride.  In the wake of these reports, a consolidated class action has been filed that alleges that Teva's version of 300 mg extended-release bupropion hydrochloride had a more rapid release that made it less effective.  <u>See</u> <u>In re Budeprion XL Mktg. & Sales Litig.</u>, MDL No. 2107, 2010 U.S. Dist. LEXIS 51980 (E.D. Pa. May 26, 2010) (Schiller, J.) (denying defendants' motion to dismiss).

The defendants' expert, Dr. Joskow, observed that such quality perception issues "might" have affected the price of generic extended-release bupropion hydrochloride.  <u>See</u> Pl.'s

Opp'n Ex. BB at 32:16-17.  The defendants also argue that branded drugs in general have a market value above generics that is in part a reflection of quality assurance that the brand is intended to convey.  The defendants conclude that price differences between branded and generic Wellbutrin reflect, at least in part, differences in perceived value.[5]

        Although there may be some qualitative differences between branded Wellbutrin XL and its generic equivalents, the FDA's certification of bioequivalence supports the plaintiff's theory of overcharge.  "FDA-approved generic drugs are certified by the FDA as bioequivalent to the branded drug whose [New Drug Application] the generic drug relied upon in its [Abbreviated New Drug Application], and are completely interchangeable with that branded drug."  Meijer, Inc., 246 F.R.D. at 297.  See also N.T. at 118 (quoting FDA, Generic Drugs: Questions and Answers, http://www.fda.gov/drugs/resourcesforyou/consumers/ questionsanswers/ucm100100.htm (last visited Aug. 2, 2011) ("A generic drug is identical — or bioequivalent — to a brand name drug in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use.  Although generic drugs are chemically identical to their branded

_____

        [5]    To the extent that the defendants' quality perception arguments relate to the amount of damages instead of the existence of antitrust impact, the Court will address that issue below.  See Joskow Dep. Feb. 15, 2011 at 46-47 (referring to quality perception issues "as mostly a damages issue.").

counterparts, they are typically sold at substantial discounts from the branded price.").

Almost all states encourage generic competition through laws that allow pharmacists to substitute brand-name drugs with their AB-rated generic equivalents, unless a physician directs otherwise. See N.T. at 55; Meijer, Inc., 246 F.R.D. at 297. Many health insurance plans encourage the substitution of available AB-rated generic drugs for their branded counterparts. Meijer, Inc., 246 F.R.D. at 297 (citations omitted). Market data from the introduction of generic Wellbutrin XL also demonstrates that generic Wellbutrin XL quickly captured the vast majority of sales volume and that generic Wellbutrin XL is indeed a substitute for branded Wellbutrin XL. See N.T. at 38:10-39:25 ("[D]epending on the time period, 70 to 90 percent of the volume converts to the generic.").

The defendants' approach would also fail to capture the full economic loss caused by the exclusionary conduct during the period when competition was suppressed. Cf. In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 531 (3d Cir. 2004) (certifying settlement class) ("Notably, [indirect purchasers] suffered direct economic harm when . . . they paid supracompetitive prices for Coumadin instead of purchasing lower-priced generic warfarin sodium."). The defendants' narrow view of overcharge is inconsistent with the underlying

25

justification for the direct purchaser rule established by
Hanover Shoe and Illinois Brick.

The Court concludes that the plaintiff may demonstrate
antitrust impact by showing that class members paid an illegal
overcharge by purchasing Wellbutrin XL instead of generic
extended-release bupropion hydrochloride as a result of the
defendants' alleged anticompetitive conduct.  This result is
consistent with other cases that have addressed this legal issue.
See, e.g., In re Neurontin Antitrust Litig., MDL No. 1479, 2011
U.S. Dist. LEXIS 7453, at *26-27 & n.12 (D.N.J. Jan. 25, 2011)
(noting that an increase in the price of Neurontin after generic
entry is "irrelevant" to antitrust impact);  Am. Sales Co. v.
SmithKline Beecham Corp., 274 F.R.D. 127, 136 (E.D. Pa. 2010)
("Delayed generic entry into the market necessarily injures those
direct purchasers, because those purchasers are forced to pay for
the more expensive branded drugs."); Meijer, Inc. v. Warner
Chilcott Holdings Co. III, 246 F.R.D. 293, 310 (D.D.C. 2007)
(same).  Cf. In re Warfarin Sodium Antitrust Litig., 391 F.3d
516, 531 (3d Cir. 2004) ("[I]t [is] well recognized that a
purchaser in a market where competition has been wrongfully
restrained has suffered an antitrust injury . . . .").  The Court
is not aware of any courts that have reached a different
conclusion.

(2)   <u>Statutory Injury Requirement</u>

Section 4 of the Clayton Act creates a private right of action for "any person who shall be <u>injured</u> in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a) (emphasis added).  The defendants initially conceded that if the direct purchasers paid an illegal overcharge, then there is no need for the plaintiff to prove actual economic harm from the complained of conduct.  <u>See</u> Defs.' Opp'n at 15-16 ("[W]here a direct purchaser pays an overcharged price it may be able to recover damages <u>even though it has suffered no actual economic harm</u>.  This is a significant departure from the normal rule in antitrust cases that an antitrust plaintiff must show economic injury <u>in fact</u> to his business or property, as a prerequisite to prevailing in its antitrust suit.") (emphasis in original).

In supplemental briefing, the defendants argued that a recent decision by the United States Court of Appeals for the Third Circuit recognizes that plaintiffs seeking antitrust damages must have suffered some "actual injury."  <u>See</u> Defs.' Supp. Opp'n at 1 citing <u>Warren Gen. Hosp. v. Amgen Inc.</u>, — F.3d —, 2011 WL 2321393 (3d Cir. June 14, 2011).  <u>Hanover Shoe</u>, the defendants argue, could not eliminate the statutory injury requirement of Section 4 of the Clayton Act, 15 U.S.C. § 15(a). Under the defendants' view, direct purchasers are not injured

27

within the meaning of Section 4 if they economically benefitted
from the alleged exclusionary conduct.  The defendants argue that
because PDC relies on an overcharge theory, it has failed to
offer class-wide means of proving "actual injury" to class
members.

In Warren General v. Amgen, Warren General Hospital was
an indirect purchaser of pharmaceuticals that were manufactured
by Amgen and distributed by AmerisourceBergen.  Warren General
alleged that Amgen violated federal antitrust law by "tying" the
purchase of two of its drugs, Neupogen and Neulasta, to the sale
of another Amgen drug, Aranesp.  The hospital argued that it
could assert claims under federal antitrust law against Amgen
because it was the entity harmed by Amgen's tying scheme, not
AmerisourceBergen.  The Court concluded that Warren General could
not assert a federal antitrust claim.

> It is a basic tenet of antitrust law that a
> cause of action will not lie if the plaintiff
> has not been harmed.  However, the hospital's
> argument conflates the different components
> of antitrust standing: the statutory
> requirement contained in Section 4 that the
> plaintiff be the direct purchaser as set
> forth in Illinois Brick and the requirement
> that the plaintiff have suffered a
> recognizable injury. . . .
>
> The question in this case is whether Warren
> General is a direct purchaser under Illinois
> Brick, and we hold that it is not.

Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 92 (3d Cir. 2011).

(citations omitted).

In rejecting the hospital's argument, the Court of
Appeals emphasized the logic of the direct purchaser rule because
a wholesaler can be injured even though an indirect purchaser
bears the majority of the injury.  Id. at 94 ("Because of the
complicated interplay between market forces, the possibility that
the wholesaler was harmed by defendant's actions exists even if
the majority of the injury is borne by the indirect purchaser.").
The Court explained that consistent application of the direct
purchaser rule is necessary to avoid being mired in difficult
calculations between direct and indirect purchaser injuries.  Id.
The injury that direct purchasers suffer is the full extent of
the overcharge, even though the overcharge may be absorbed by
other parties.

> [O]n balance . . . the legislative purpose in
> creating a group of private attorneys general
> to enforce the antitrust laws . . . is better
> served by holding direct purchasers to be
> injured to the full extent of the overcharge
> paid by them than by attempting to apportion
> the overcharge among all that may have
> absorbed a part of it.

Id. at 95 (quoting Illinois Brick, 431 U.S. at 746) (emphasis
added).

The Court reads Warren General as reaffirming the long-
standing rule that a direct purchaser suffers injury within the
meaning of 15 U.S.C. § 15(a) from an overcharge even if "the
majority of the injury" is borne by indirect purchasers.  Warren

29

General, 643 F.3d at 94-95.  If the direct purchaser class
members paid an illegal overcharge, they have been injured within
the meaning of Section 4 of the Clayton Act.  See id. at 92;
Hanover Shoe, 392 U.S. at 491 (noting the "general principle"
that "the victim of an overcharge is damaged within the meaning
of § 4 to the extent of that overcharge.").

(3)   Application

        The Court concludes that to demonstrate antitrust
impact, the plaintiff must first show that the price of generic
extended-release bupropion hydrochloride would have been lower
than Wellbutrin XL absent the defendants' anticompetitive
conduct.  The plaintiff must also show that the class members
would have substituted at least some generic extended-release
bupropion hydrochloride for Wellbutrin XL during the class
period.  See Neurontin, 2011 U.S. Dist. LEXIS 7453, at *28
(D.N.J. Jan. 25, 2011).

        The next issue is whether common evidence can
demonstrate that generic prices would have been lower than
branded prices in the "but for world."  The plaintiff's expert,
Dr. Leitzinger, presented three types of evidence to support
class-based evidence of antitrust injury: (1) economic research
and literature relating to the price relationship between branded
and generic drugs, (2) the defendants' and generic manufacturers'

30

internal forecasting documents, (3) and empirical data
demonstrating that generics did enter the market at lower prices
and were rapidly substituted for branded Wellbutrin XL.  See N.T.
34-46; Pl.'s Mot. Ex. N ("Leitzinger Decl."); Pl.'s Reply Ex. W
("Leitzinger Reb. Decl.") ¶¶ 4-7.

        Dr. Leitzinger presented evidence that the price of
extended-release bupropion hydrochloride would have been lower
than Wellbutrin XL at all times in the "but for world" absent the
defendants' anticompetitive conduct.  Dr. Leitzinger explained
that economic literature provides an understanding regarding the
general effects of generic entry on the market for a branded
pharmaceutical.  See N.T. at 34-35 ("[The literature has] a
common bottom line . . . which is generic drugs save a lot of
money.").

        Dr. Leitzinger also presented Biovail's internal
forecasting documents, which showed that within 12 months,
Biovail forecasted that the branded market share would decrease
to around 12%-13%, from 100% in the previous year.  N.T. 36-37,
Pl.'s Ex. 8.  Dr. Leitzinger also presented sales data from five
generic manufacturers of extended-release bupropion
hydrochloride.  Upon initial generic entry, the average price of
the generic was approximately 25% below the branded price, which
decreased to about 10% of the branded price two years after
generic entry.  N.T. at 39.  Dr. Leitzinger acknowledged that

there is some variability in generic prices based upon
negotiations with generic manufacturers and other factors, but
prices of generics are always cheaper than branded prices.  N.T.
43-44.  The defendants' rebuttal evidence failed to contradict
this point.  See N.T. at 122 (Dr. Joskow testifying that prices
for generics, whether purchased directly or indirectly from
generic manufacturers, were always lower than prices for
Wellbutrin XL).

     The defendants, however, did present evidence that
raises questions regarding whether common proof can be used to
demonstrate antitrust impact for class members that did not
purchase extended-release bupropion hydrochloride after it became
available and for class members who were indirect purchases of
generic extended-release bupropion hydrochloride.

     Two direct purchasers did not purchase extended-release
bupropion hydrochloride after it became available, Allied Med
Wholesale Drug, Co. and Goodwin Drug Co. N.T. at 40-41.  For
entities that did purchase extended-release bupropion
hydrochloride after it became available, it is a reasonable
inference that these entities would have purchased extended-
release bupropion hydrochloride in the "but for world," absent
the alleged exclusionary conduct.  This inference, however, is
not persuasive for Allied Med Wholesale Drug, Co. and Goodwin
Drug Co. without additional evidence.  Proof of antitrust impact

for these class members would require individual analysis into
the antitrust impact, if any, they suffered from the alleged
conduct.  The Court finds that the plaintiff has not proven that
it can demonstrate antitrust impact with class-wide evidence for
these two entities and the Court will exclude them from the class
definition.  Plaintiffs and courts in other delayed generic entry
cases have modified class definitions to accommodate this
concern.  See Neurontin, 2011 U.S. Dist. LEXIS 7453, at *34
(D.N.J. Jan. 25, 2011); K-Dur, 2008 WL 2699390, at *21
("[E]xcluded are persons or entities who have not purchased
generic versions of K-Dur 20 after the introduction of generic
versions of K-Dur 20.").

            Four of the direct purchasers, including the plaintiff
PDC, were indirect purchasers of extended-release bupropion
hydrochloride.  These direct purchasers of Wellbutrin XL did not
buy generics directly from the generic manufacturer, but rather
bought generics indirectly from other wholesalers or
distributors.

            These indirect purchasers of generics, however, were
still direct purchasers of Wellbutrin XL under Hanover Shoe and
Illinois Brick.  The relevance of the generic purchases is that a
fact finder could infer that these entities would have made
generic purchases in the "but for" world, and thereby may have
suffered an alleged overcharge for actual purchases of branded

Wellbutrin XL.  See Howard Hess, 424 F.3d at 373.

These class members' direct branded purchases can be shown through common data applicable to all direct purchasers. The class members' indirect generic purchasers can also be demonstrated through chargeback data from Teva and sales data from four generic distributors, Top Rx, Masters Pharmaceuticals, Auburn Pharmaceuticals, and Quest Pharmaceuticals.  See Leitzinger Reb. Decl. ¶ 36 & n.43.  These purchasers may have paid more for extended-release bupropion hydrochloride because they purchased from distributors instead of directly from the manufacturers, but any differences relate to the amount of damages, not fact of damages.  N.T. at 44 (Leitzinger testifying) ("[Y]ou may have people that buy [generics] further down the distribution chain . . . [b]ut that doesn't change at all the basic reality that those prices are going to be much lower than the brand would have been.").  Because the alleged overcharge for these purchasers can be demonstrated with distributor and manufacturer data that does not depend on individual class members, any individual issues for proof of antitrust impact for these four class members will not predominate over issues common to the class.

The Court concludes that the plaintiff has shown that for the class members that purchased branded Wellbutrin XL during the class period and extended-release bupropion hydrochloride

34

after it became available, these class members would have
converted some purchases of branded Wellbutrin XL to generic
extended-release bupropion hydrochloride in the "but for world."
The plaintiff has also shown that evidence of the alleged
overcharge can be shown with data that is common to the class.
The Court therefore finds the predominance requirement has been
satisfied for class members who purchased <u>both</u> extended-release
bupropion hydrochloride and Wellbutrin XL.  The Court excludes
from the class definition direct purchasers who did not purchase
extended-release bupropion hydrochloride after it became
available.


                    c.   <u>Measurable Damages</u>

          The third element for each of the plaintiff's causes of
action is measurable damages.  At trial, "[i]t is not necessary
to show with total certainty the amount of damages sustained."
<u>Rossi v. Standard Roofing, Inc.</u>, 156 F.3d 452, 483 (3d Cir.
1998).  A jury is permitted to calculate the actual damages
suffered using a "reasonable estimate, as long as the jury
verdict is not the product of speculation or guess work."  <u>Id.</u> at
484 (citations and quotations omitted).  <u>See also</u> <u>Lower Lake</u>
<u>Erie</u>, 998 F.2d at 1176 ("the relaxed measure of proof is afforded
to the amount, not the causation of loss . . . .") (citations
omitted).

                              35

At the class certification stage, the plaintiff is not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis.  See Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 303 (5th Cir. 2003) (noting that section 4 plaintiffs must provide a "just and reasonable estimate of the damage based on relevant data."); Neurontin, 2011 U.S. Dist. LEXIS 7453, at *40 (D.N.J. Jan. 25, 2011).

The Third Circuit has explained that plaintiffs may choose in an antitrust case between either seeking overcharges or lost profits, and in this case, the plaintiff has chosen to pursue overcharges.  See Howard Hess, 424 F.3d at 375 (noting that overcharges avoid "the complex netting associated with lost profits") (quoting Roger D. Blair & William H. Page, "Speculative" Antitrust Damages, 70 Wash. L. Rev. 423, 433-34 (1995)).[6]

Dr. Leitzinger's damages methodology is based on the

---

[6]     See also id. at 374 (quoting ABA Section of Antitrust Law, Proving Antitrust Damages 193-94 (1996) ("Where a group of suppliers conspires to . . . prevent a more efficient supplier from entering the market . . . purchasers from the conspirators would also have antitrust claims because they pay higher prices as a result of the exclusionary practice.  The purchasers' damages would be based on the overcharge they paid measured by the difference between the price actually paid and the price that would have been paid absent collusion, multiplied by the quantity.").

"before and after" method.  This methodology produces an
aggregate damages estimate that is based on deriving a benchmark
for generic prices in the "but for world" based on the actual
experience for branded and generic prices after entry.  The
market data for actual sales is "backcasted" to estimate prices,
but for the alleged delay.  Dr. Leitzinger proposes to calculate
damages as the difference between the weighted-average price that
class members paid for all extended-release bupropion
hydrochloride products (branded plus generics) and the weighted
average that class members would have paid but for the alleged
conduct.  Dr. Leitzinger then multiplies the difference by the
volume of extended-release bupropion hydrochloride in the but-for
world to arrive at an aggregate measure of overcharge.
See Leitzinger Decl. at 37-43; Leitzinger Reb. Decl. ¶¶ 38-58;
N.T. at 46-59.[7]

        The defendants present three main critiques of Dr.
Leitzinger's damages model.  First, Dr. Joskow argues that the
plaintiff's model fails to account for price effects unrelated to
the defendants' conduct such as quality differences between
generic and name brand Wellbutrin XL.  Second, Dr. Joskow faults
the model for using a single ratio and average prices to

---

        [7]   This methodology has been used in similar cases that
allege unlawful delay of generic competition.  See, e.g.,
Neurontin, 2011 U.S. Dist. LEXIS 7453, at *41 (D.N.J. Jan. 25,
2011); K-Dur, 2008 WL 2699390, at *19-20; Cardizem, 200 F.R.D. at
323.

calculate aggregate damages.  Third, Dr. Joskow argues that the model is overinclusive because the direct purchasers would have made fewer purchases in the "but for world."

The plaintiffs have adequately rebutted the defendants' argument that the damages model fails to account for the possible price effects of quality perception issues.  Dr. Joskow noted that he had not done an empirical analysis to address whether the price of Teva's generics was affected by perception issues, but he opined that a damages model should account for the difference. See Pl.'s Opp'n Ex. BB at 46.  Dr. Leitzinger countered that the data showed that Teva's prices were actually higher than prices charged by other generic manufacturers.  See Leitzinger Reb. Decl. ¶ 57.  Biovail's internal analysis also concluded that "it seems like the data is showing that the market has not penalized Teva's formulation."  Id.  Furthermore, Dr. Leitzinger testified that the overcharge model could accommodate this concern, if borne out by the data.  N.T. at 56:1-12.

Dr. Leitzinger has also clarified that his methodology does not rely on a single price ratio for the damages period, as Dr. Joskow suggested.  Rather, Dr. Leitzinger used a single ratio as an example in his initial declaration because he was modeling data from the first six months of entry when there was only one generic entrant.  See Leitzinger Reb. Decl. ¶ 44.  Dr. Leitzinger also explained that the use of average prices and price ratios

properly accounts for "chargebacks," which result when direct
purchasers are reimbursed for sales to contract customers that
are priced below the direct purchasers' acquisition price.  Dr.
Joskow's calculations based on daily price calculations, Dr.
Leitzinger observes, "reflect wild swings day-to-day purely as a
result of the inherent mismatch between sales and chargebacks
that daily averages produce."  Id. ¶ 48.  By averaging sales
transactions over longer periods of time, the actual price is
more accurately reflected.  Id.  The Court is persuaded that Dr.
Leitzinger has set forth a reliable damages methodology.

        The defendants also argue that the plaintiff's model is
flawed because it fails to account for generic bypass.  Generic
bypass refers to the situation whereby direct purchasers may lose
sales volume because end purchasers often buy generics directly
from the generic manufacturer and "cut out the middle man" or
"bypass" the wholesaler.  The defendants argue that Dr.
Leitzinger's methodology calculates total damages based on the
total number of tablets that class members actually purchased
rather than the number of tablets that the class members would
have purchased in the but-for world.  The number of tablets in
the but-for world would likely be lower because of the generic
bypass phenomenon.  In response to the defendants' generic bypass
arguments, Dr. Leitzinger explained that bypass can be "readily
incorporated into my overcharge calculation by reducing the

volumes used in calculating the overcharge by the amount of bypass the occurred following generic entry in the actual world." Leitzinger Reb. Decl. ¶ 42.

In <u>In re Relafen Antitrust Litigation</u>, the United States District Court for the District of Massachusetts concluded that reducing damages because of generic bypass argument is inconsistent with <u>Hanover Shoe</u>.  <u>See</u> <u>In re Relafen Antitrust Litig.</u>, 346 F. Supp. 2d 349, 369 (D. Mass. 2004).  At this stage, however, the Court need not resolve whether the effects of generic bypass must be deducted from damages because the plaintiff's burden at this stage is to demonstrate a reliable methodology to estimate class-wide damages.  The plaintiff has done so here.  <u>See</u> <u>Neurontin</u>, 2011 U.S. Dist. LEXIS 7453, at *42–43 (D.N.J. Jan. 25, 2011) (noting that the plaintiffs offered a reasonable, judicially recognized methodology for calculating damages and have shown that the data needed to make these calculations is available and common to the class).  Whether or not generic bypass must be accounted for is a matter that can be accommodated within the methodology proposed by Dr. Leitzinger.

    2.  <u>Superiority</u>

Lastly, the Court considers whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This

"requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative methods of adjudication."  In Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998).  It is meant to ensure that resolution by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision without sacrificing procedural fairness or bringing about other undesirable results." Amchem, 521 U.S. at 615 (quoting Advisory Committee's Note on Fed. R. Civ. P. 23).

        The Court finds that the superiority requirement is met here.  As discussed above, this action involves numerous complex issues of law and fact that are common to the class.  Individual treatment of each class members' claims would require duplicative, expensive litigation, which would come at enormous expense to the parties and judicial economy.  Class resolution would also avoid problems of inconsistent resolution.  This result is consistent with other courts that have addressed similar cases.  See, e.g., Neurontin, 2011 U.S. Dist. LEXIS 7453, at *45-47 (D.N.J. Jan. 25, 2011); Meijer, 246 F.R.D. at 313; Relafen, 218 F.R.D. at 346.


III. Conclusion

        The Court concludes that the plaintiff has satisfied

41

its burden to certify a class of direct purchasers of Wellbutrin XL who also purchased extended-release buproprion hydrochloride after it became available.

An appropriate order will follow separately.